(No. 81624.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TERRENCE BROOKS, Appellant.

*Opinion filed June 17, 1999.—Rehearing denied October 4, 1999.*

94

FREEMAN, C.J., joined by BILANDIC and McMORROW, JJ.,
specially concurring.
HARRISON, J., concurring in part and dissenting in part.

Charles Schiedel, Deputy Defender, of Springfield,
and Steven Clark, Assistant Defender, of Chicago, both of
the Office of the State Appellate Defender, for appellant.

Richard A. Devine, State's Attorney, of Chicago
(Renee Goldfarb and Celeste Stewart Stack, Assistant
State's Attorneys, of counsel), for the People.

JUSTICE RATHJE delivered the opinion of the court:
On August 7, 1991, three members of the Gangster
Disciples street gang were killed during two drive-by
shootings in Chicago's Englewood neighborhood. The
shots that killed them were fired from a taxicab by
members of a rival gang, the Black Disciples. The shoot-
ings were provoked by an earlier incident in which a
member of the Gangster Disciples shot at the car of a
Black Disciple. In connection with the incident, a grand
jury indicted defendant, Terrence Brooks, for three
counts of first degree murder (intentional) (Ill. Rev. Stat.
1991, ch. 38, par. 9—1(a)(1)), three counts of first degree
murder (knowing) (Ill. Rev. Stat. 1991, ch. 38, par.
9—1(a)(2)), three counts of attempted first degree mur-
der (Ill. Rev. Stat. 1991, ch. 38, pars. 8—4(a), 9—1(a)),
three counts of conspiracy to commit first degree murder
(Ill. Rev. Stat. 1991, ch. 38, pars. 8—2(a), 9—1(a)(1)), and
one count of aggravated discharge of a firearm (Ill. Rev.
Stat. 1991, ch. 38, par. 24—1.2(a)(2)). The State later
nol-prossed the aggravated discharge of a firearm and
conspiracy counts.

Defendant and a codefendant, Maurice Deloney, were

tried in a bench trial that was conducted simultaneously with the jury trial of Ivan Smith and the severed bench trials of Javan Deloney and Curtis Milsap. The circuit court of Cook County found defendant guilty of six counts of first degree murder and three counts of attempted first degree murder. Defendant was convicted based upon the statements of several eyewitnesses. Following a sentencing hearing, a jury found no mitigating factors sufficient to preclude the death penalty. Accordingly, the court sentenced him to death. Defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

## MOTIONS TO SUPPRESS

Prior to trial, defendant moved to suppress the identification testimony of three witnesses: Allen Epton,[1] George Cruthard, and Brenda Hall. In his motions, defendant alleged that the police used unnecessarily suggestive procedures when seeking to elicit identifications from these witnesses. Defendant sought to suppress in-court identifications as well as any testimony about photographic and lineup identifications. The following evidence was adduced at the hearings on the motions to suppress.

### Allen Epton

Detective Daniel McWeeny of the Chicago police department testified that on August 7, 1991, he was assigned to investigate two shootings that occurred on Chicago's south side. McWeeny learned that one shooting occurred in the 500 block of 71st Street, and another occurred near 66th Street and Peoria Street. A taxicab had been sighted at both locations, and 9-millimeter shell

---

[1] Epton testified that his name is actually spelled "Eppting." However, he is generally referred to in the common law record and the transcripts as "Epton." To avoid confusion, we will continue to use that name.

casings were found at both places. A red Chrysler Le-Baron was also involved in the shootings. Three victims were killed: John Coleman and Greg Archibald at 71st Street, and Rhenardo Bussle at Peoria Street.

McWeeny went to St. Bernard's Hospital to speak to Allen Epton, a victim who survived the 71st Street shooting. McWeeny first spoke to Epton at approximately 1:30 a.m. on August 8, 1991. Epton told McWeeny that he was with Coleman and Archibald on 71st Street and that shots were fired from a red LeBaron and a taxicab. This interview lasted only five minutes. McWeeny, accompanied by Detective Ptak, returned to the hospital at 11 a.m. McWeeny told Epton that he had spoken to Marcus Taylor, another Gangster Disciple, and had learned about the gang war between the Gangster Disciples and the Black Disciples. McWeeny also informed Epton that Archibald and Coleman were dead. After learning that his friends had died, Epton told the detectives that he would tell them what happened.

Epton told the detectives that he was a member of the Gangster Disciples. He had been standing on 71st Street the night before with two friends, Archibald and Coleman. A taxicab and a red LeBaron drove by, and shots were fired from both cars. Epton, Archibald, and Coleman were all shot. Epton said that the people in the cab were Black Disciples. The taxicab was driven by "Tojo." Epton believed that the LeBaron was sometimes driven by "Dada," but he did not see Dada in either of the cars. However, he did see two of Dada's relatives. One was nicknamed Pete, and both had the last name Deloney. The only other person Epton remembered seeing was Ollie Bays. Epton described the perpetrators as male blacks in their late teens or early twenties.

McWeeny later returned to the hospital with eight Polaroid photographs. Epton identified Maurice and Javan Deloney as participants in the 71st Street incident.

McWeeny then spoke with Javan Deloney. Javan verified that he, Maurice, Tojo, and Ollie Bays were involved. He added that defendant and Curtis Milsap were also involved. McWeeny then took more photographs to Epton's room. One photo array was made up of six color photos and included defendant's picture. The other array was of nine black and white pictures and included pictures of Milsap and Bays. Epton identified defendant, Milsap, and Bays as being involved in the shooting. He identified defendant as one of the shooters. McWeeny later learned that "Tojo" was Ivan Smith. He added Smith's photo to the black and white photo array previously shown to Epton and asked Epton if he could identify anyone else. Epton identified Smith as the person he knew as Tojo. Shortly after Epton identified defendant from the photo lineup, defendant was arrested. Epton then identified defendant in a live lineup conducted by Detective James O'Brien. Defendant was the only person in the lineup whose photograph Epton had previously viewed.

Allen Epton testified that he was one of the people who was shot on 71st Street. The police came to see him in the hospital, and he spoke to them several times before he was shown any photographs. Epton testified that defendant's photograph was among those he viewed in the hospital. Epton had not mentioned defendant to the police. Before August 7, 1991, he knew who defendant was, but only by the name "Terry." Epton denied naming any perpetrators before he looked at the photographs. When asked how the police showed him the photographs, Epton testified that the police emphasized defendant's picture. The police kept flipping through the pictures and stopping at defendant's picture while saying, "This is the person. Isn't this him?" Epton said that he knew defendant, but did not know if defendant was involved in the shooting. The police kept going back to

defendant's picture and saying it was him. They did not emphasize any other pictures. Epton denied telling the police that defendant was involved in the crime.

The court declined to rule on the admissibility of Epton's identifications. The State argued that there was no identification to suppress because Epton denied making an identification. Defendant's attorney argued that the police testified that Epton did make an identification, so the court would have to rule on whether suggestive techniques rendered that identification inadmissible. The trial judge did not rule on the suggestiveness of the identification procedure, saying that it was a question for the trier of fact.

## George Cruthard

George Cruthard testified that he was one of three persons shot at 6556 South Peoria at 10:50 p.m. on August 7, 1991. The others were Marcus Taylor and Rhenardo Bussle. Almost two years later, in June 1993, Cruthard was taken to view some photographs at the State's Attorney's office. An assistant State's Attorney, Michael Smith, was present, as well as two homicide detectives. Cruthard had been brought to the State's Attorney's office several times during the previous three or four months. He had spoken to Smith several times prior to viewing the photographs. During those visits, Smith told him, "We already know who shot you; Little Terrence shot you." Smith also told Cruthard that Tojo was involved in the incident. Cruthard knew that Tojo was Ivan Smith. Cruthard understood that "Little Terrence" or "Little Terry" referred to defendant. Cruthard identified defendant in court. He testified that Smith mentioned other names but that he did not remember them.

Cruthard identified the six photographs he was asked to look at in June 1993. One of the pictures was of defendant. Cruthard testified that he picked out that picture and identified it as being of defendant. He also picked

Tojo's picture out of the photo array. On cross-examination, Cruthard testified that he had known defendant and Tojo for a number of years.

Detective Joseph Stehlik of the Chicago police department testified that he located Cruthard in the Cook County jail in June 1993. Stehlik found Cruthard there after he read in the paper that Cruthard was arrested for trying to bring several kilos of cocaine into Chicago. During an interview with Stehlik, Cruthard said that he witnessed the events of August 7, and that defendant and Ivan Smith were involved. Stehlik then showed Cruthard six photographs, and Cruthard picked out defendant and Ivan Smith. Stehlik identified the pictures that he showed to Cruthard.[2]

### Brenda Hall

Brenda Hall testified that on April 1, 1993, she went to the State's Attorney's office with Detective Mike Kill. Assistant State's Attorney Mike Smith asked her to view some photographs that were lying on a table. Hall picked out photographs of Javan Deloney and defendant. Prior to that date, she had been to the State's Attorney's office three or four times, the first time in September 1991. Smith had questioned her about the shootings during two of those visits, but she did not tell him anything. She did not say anything about any of the perpetrators prior to viewing the photographs. Hall testified that no one with the State's Attorney's office said anything to her before showing her the photographs. At the State's Attorney's office, Hall was asked if she had ever seen any of

---

[2]The State points out that Stehlik denied that he told Cruthard that defendant and Ivan Smith were involved in the shooting. However, this information was elicited by the attorney for Ivan Smith, whose case had been severed from defendant's. As the State acknowledges in footnote 2 of its brief, we should not consider testimony from cases that were severed from defendant's case.

the boys before. Hall testified that she "told them no, because they almost killed me and my baby."

After Hall testified, defendant's attorney rested as to the motions to suppress Hall's and Cruthard's testimony. Without hearing argument or giving any explanation, the trial judge stated, "Your motion will be denied." Defendant's attorney then began to argue with respect to Cruthard and pointed out that there was unrebutted testimony that Mike Smith told Cruthard before showing him the photographs that defendant and Ivan Smith were involved in the shooting. The judge then stated, "Goes to weight, not admissibility. It will be denied."

## TRIAL

### Peoria Street

Officer Patrick Doyle of the Chicago police department testified that on August 7, 1991, he was on beat patrol. Shortly before 11 p.m. he received a call that shots were fired and a person was shot at 6556 South Peoria, a multistory apartment building. When Doyle arrived, he saw a victim lying in the walkway leading to the front door of the apartment building. The door was a common entrance to both 6556 and 6558 South Peoria. The victim was bleeding from a chest wound. Doyle eventually ascertained that the victim was Rhenardo Bussle. Doyle noticed bullet holes around the front door of the apartment building. The street lights in front of the building were on at the time.

Doyle spoke to a few witnesses and then put out a description of a red and white taxicab that was wanted in connection with the shooting. Doyle further learned that two other victims of the shooting had fled to 6539 South Sangamon. Doyle went to that address and found the two victims, George Cruthard and Marcus Taylor. Cruthard had a wound to the left side of his neck, and Taylor had a wound on the right side of his abdomen. Neither Cruthard nor Taylor would give Doyle any information about the crime.

George Cruthard testified that he was currently serving a 15-year prison sentence for a narcotics offense. During the late afternoon of August 7, 1991, he was standing on the corner of 66th and Peoria. Several of Cruthard's "homies" were with him. A shot was fired at a car belonging to Tojo (Ivan Smith). The shot came from the same side of the street that Cruthard was standing on. Cruthard acknowledged that he was a member of the Gangster Disciples and that the gang sold drugs from 6558 South Peoria. Tojo was a member of the Black Disciples street gang, and there was an ongoing conflict or "war" between the two gangs. Cruthard did not know if Tojo got hit by the shot. After the shot was fired, Cruthard fled the scene.

At approximately 10 or 11 p.m., Cruthard was again standing in front of 6556-58 South Peoria. He was with Marcus Taylor and Rhenardo Bussle. Cruthard observed three cars coming slowly from the direction of 64th Street towards 66th Street. The car in the middle was a taxicab with its headlights turned off. As the cars moved closer, the windows on their passenger sides went down. Cruthard did not see anyone rolling the windows down because he was not paying attention. Cruthard recalled seeing that Tojo was driving the cab. He also remembered seeing defendant in the cab. Cruthard identified defendant in court. Cruthard had known defendant for about four years and knew him to be a member of the Black Disciples. When Cruthard saw defendant, defendant was in between the front and back seats of the cab, leaning forward towards the door. Cruthard testified that defendant appeared to be shooting. Cruthard saw flashes of lights coming from the cab and could not see anyone else's face. The cab was five or six yards away when the shooting started. Marcus Taylor was standing up as if he were in a daze, so Cruthard knocked him down and lay on top of him. The shooting continued, and Cruthard felt

a burning sensation in his back. Cruthard jumped up and ran towards the gangway on the side of the building. While Cruthard was running down the gangway toward his house, he was shot in the jaw and the back of the head. He made it to his house, and his mother called an ambulance. Taylor also made it to Cruthard's house and was bleeding at the time.

Cruthard remembered speaking to some police officers at the hospital, but did not remember specifically to whom he spoke. Cruthard did not tell the police who was involved in the incident because he did not want the police to arrest him and he was worried about himself and his family. Cruthard then went into hiding from the police. Eventually, he was arrested on a narcotics offense. On June 8, 1993, 22 months after the shooting, he gave a court-reported statement to the State's Attorney's office. Shortly thereafter he was sentenced to 15 years in the Department of Corrections for the narcotics offense. He testified that, although there was no agreement in exchange for his statement, the State's Attorney would recommend that he be sent to Stateville or Pontiac.[3]

On cross-examination, Cruthard acknowledged that he originally told the police that, because he dropped something and was bent over picking it up when the shooting started, he did not see anything. Cruthard also acknowledged that the shooting was going on for only a second or so before he dove on top of Taylor. When Cruthard was arrested for the narcotics offense in December 1992, he had been caught with approximately 10 pounds of cocaine. In May 1993, he lost a motion to suppress the evidence in that case. Before he gave his statement to Mike Smith on June 8, 1993, he had been to the State's Attorney's office twice. On those occasions,

---

[3]It seems clear that Cruthard meant that the recommendation was that he would *not* be sent to Stateville or Pontiac.

Smith stated that he knew who shot Cruthard. However, Smith did not tell him that it was defendant or Tojo.

Cruthard acknowledged that he previously testified that Smith did tell him prior to his viewing the photographs that Tojo and defendant shot him. He now denied that Smith did so, but testified that he was not lying before when he said that Smith made those assertions. The first time Cruthard told anyone about seeing defendant in the taxicab was June 8, 1993. That was also the same day he was sentenced on his drug case.

Cruthard testified that defendant was not leaning out of the cab at the time of the shooting. Defendant was inside the car and the lights were off inside the car; the street lights on the corner were lit. According to Cruthard, everybody on the street knew within a week or two of the shooting that defendant had been arrested.

Jerome Taylor (a/k/a Marcus Taylor) testified that in the late afternoon hours of August 7, 1991, he was standing at the corner of 66th and Peoria Streets. The building at that corner is a hangout for the Gangster Disciples; they sold drugs in front of the building. Cruthard and Kevin Gibbs were with Taylor on the afternoon of August 7 when Tojo drove by. Taylor had known Tojo for four or five years. Tojo flashed a gang sign at them, and Gibbs flashed one back and said, "BDK" (Black Disciple killers), to which Tojo replied, "GDK" (Gangster Disciple killers). Someone from the building fired a shot at Tojo's car, and Tojo drove to the middle of the block and then said that he would be back. Taylor testified that the Gangster Disciples were at war with the Black Disciples at the time.

At 11 p.m. the same day, Taylor was selling drugs in front of the same building with Bussle (Taylor's cousin) and Cruthard. Taylor saw two cars drive up. The one in front was a red LeBaron, and the other was a taxicab. The LeBaron stopped in the middle of the intersection,

and the taxicab stopped in front of the building. Taylor noticed the windows on the taxicab's passenger side being rolled down and saw the nose of a gun come out. When the shooting started, he could not see who was doing it. Cruthard pushed Taylor down, and Taylor lay on the sidewalk until the shooting died down. The taxicab was stopped for about 30 seconds while the shooting was occurring.

When the shooting subsided, Taylor got up and checked on his cousin. At that time he saw defendant in the front passenger seat of the taxicab, and then the taxicab sped away. Taylor had known defendant for about 12 years. He identified defendant in the courtroom. Taylor could not identify anyone else in the taxicab. Taylor testified that Cruthard got up and fled when the shooting died down, and the shooting stopped altogether when Cruthard ran away. Taylor checked on Bussle and found him choking on blood and saying "it hurts." Bussle then passed out, and Taylor went to find Cruthard. Taylor had been grazed with a bullet, but did not go to the hospital when Cruthard did because he did not want to get involved.

Taylor spoke to the police a day after the shooting but did not tell the police that he saw who did the shooting. His reason for not saying anything to the police was that the war was still going on and he did not want to be next. He finally gave a statement to an assistant State's Attorney on April 8, 1993. He did so because his aunt (Bussle's mother) was "coming down" on him and encouraging him to do the right thing. He was shown quite a few pictures at the State's Attorney's office, but defendant's was not one of them. Taylor testified that neither the police nor the assistant State's Attorney told him that defendant was a shooter. Taylor acknowledged that within a week or two of the shooting the Gangster Disciples knew that defendant had been arrested.

### 71st Street

Officer Clarence Longley of the Chicago police department testified that he was assigned to a beat car in the Englewood neighborhood on August 7, 1991. His partner, Officer DeAngeles, was with him. Shortly after 11 p.m. he received a dispatch that a person had been shot at approximately 618 West 71st Street. When the officers arrived, they found that three persons had been shot. One was in an ambulance, another was lying on the curb, and another was lying inside a submarine sandwich shop. The officers spoke with some witnesses and then left to look for a red and cream taxicab that was reported to have been used in the shootings. Officers Longley and DeAngeles were called back to the scene to do the paper work. Longley identified photographs showing where John Coleman and Gregory Archibald were lying after being shot. Longley testified that all of the street lights in that area were working that night.

Detective James O'Brien of the Chicago police department testified that he stopped briefly at the Peoria Street location and was on his way to 71st Street when he heard over the radio a description of the taxicab used in the shootings. At a vacant lot at 6801 Normal, O'Brien spotted a cab that matched the description. O'Brien looked inside and noticed numerous shell casings strewn about. He believed that all of the shell casings were in the backseat of the cab.[4] There were no keys in the ignition, and the left-hand side of the steering column had been peeled open. The next day, O'Brien received a description of a red LeBaron that was involved in the incident. O'Brien also learned that a gray Chevrolet Chevette was connected to the crime. He located that car at 6750 South Emerald. The car had bullet holes in it. Ivan Smith's

---

[4]Patrick Moran, the evidence technician who processed the cab, found 62 shell casings in the cab and all were in the rear passenger area.

name was on the "license applied for" form displayed in the car's rear window. O'Brien could not locate the Chevette again until March 1993. At that time the car still belonged to Smith and there was duct tape over the bullet holes.

Marcella Scott testified that on August 7, 1991, she was in the vicinity of 71st Street and the Dan Ryan. She went there with her cousin, Brenda Hall. Scott was driving a white Camaro, and Hall was in a red Cavalier. Hall had her infant son with her. Scott's and Hall's cars were pulled up on the side of 71st Street, with Hall's car in front of Scott's. Hall was speaking to her boyfriend, Allen Epton. Epton went into a store after speaking with Hall. A short time later, Scott heard a sound like firecrackers going off. She felt a burning sensation in her back and turned around and noticed that her rear window had been shattered.

Scott got out of her car. She did not see anything unusual about any of the passing cars and did not see any guns. She then noticed a cab going towards the viaduct. She did not see any of the faces in the cab. Scott noticed that Hall's car had been shot too. Hall yelled to Scott to get back in her car and the two of them drove away. Before she drove away, Scott noticed that two persons had been shot. One was on the ground and another was standing in the doorway of the sub shop.

Brenda Hall testified that in August 1991 she lived at 1500 East 73rd Street. She no longer lived there because the Cook County State's Attorney's office helped her move. She was given $750 for her first and last month's rent and $150 for moving expenses.

On August 7, 1991, Hall was with her eight-month-old son and her cousin, Marcella Scott. They decided to go to 71st Street to see a friend of Hall, Allen Epton. They went in two separate cars. Hall and her baby were in her red Cavalier, and Scott was in a white Camaro.

They parked on the side of 71st Street that had stores on it. Hall was parked next to a restaurant, and Scott was parked behind her. Epton came over to Hall's car and talked to her for 10 or 15 minutes. Hall was holding her son on her lap.

Hall told Epton that the person in the car behind her was Marcella. Epton then went back and spoke to Scott. Hall was playing with her son when she heard what sounded like fireworks. Hall turned her head to the right and looked towards the street. She saw a taxicab and could see two persons firing guns inside the cab. She identified Javan Deloney and defendant as the people she saw in the cab. Hall testified that the cab kept moving. Hall's son was screaming and she put him in the car seat. She looked around and could see three persons on the sidewalk. One of them was Epton, who had been shot in the foot. One of the other people was just lying there, and another was spitting up blood and asking Hall for help. Scott then told Hall that they should drive around the corner.

After they got around the corner, they noticed that their cars had been shot. Hall found a piece of a shell inside her car. The rear window of Scott's car was gone, and there was a bullet hole in the car. Hall identified pictures of the taxicab. She also identified a series of photographs that she was shown on April 1, 1993. She picked out pictures of Javan Deloney and defendant as being pictures of the shooters.

On cross-examination, Hall testified that the people in the cab were not wearing hoods or hats. She remembered that defendant was in the front of the cab. She did not know if Epton or Coleman were Gangster Disciples. When Hall first heard the shots they sounded like they were coming from behind her. Marcella asked if she heard it. That is when Hall turned around and saw the cab driving by at a high rate of speed. She did not see any

other cars. Hall testified that she looked at the cab for only two seconds before diving to cover up her baby. Prior to the shooting, she had never seen the two persons she later identified.

Hall testified that she was not shown any photographs for identification purposes until April 1993. She had spoken with Detective Kill before that but had not spoken to Mike Smith. Until April 1, 1993, Smith had never asked her what happened the night of the shooting. She then admitted that she went to Smith's office in September 1991 when she took in a bullet that she found in her car. She said that she gave the bullet to Smith, and he did not ask her any questions. She denied speaking to Smith at any other time before April 1, 1993. She said that her previous statement that she had been to Smith's office three or four times before April 1 was not accurate. She then said she was not sure how many times she had been to Smith's office.

Hall testified that her window was rolled all the way down at the time of the shooting. Her driver's side door was shot, but the window was not damaged. She acknowledged that the bullet she brought to Smith passed all the way through the driver's side door and landed in her lap.

Before Hall looked at the photographs, she had never heard defendant's name. Allan Epton never mentioned it to her, nor did any of the police or the assistant State's Attorneys. The only time she ever saw defendant before picking out his picture was in the two seconds she looked at the cab. Hall testified that it was dark inside the cab and defendant was wearing a dark shirt. She saw defendant leaning out of the front window and another person leaning out of the back window. Both of these people were leaning far enough out that their chests were outside the car.

Hall acknowledged that the name "Terry Brooks" was written on the back of defendant's picture that she

selected from the photo array. Hall did not know who wrote it, but it was there when she saw the photographs. She said that she had seen the photographs twice before. She said that no one ever told her the person in the photo was defendant, but acknowledged that all one would have to do is look at the back of the picture. First she testified that she had not looked at the back of the picture, but then testified that she had.

Allen Epton testified next. After testifying that he knew defendant, Allen Epton identified him in the courtroom. On August 7, 1991, Epton was shot in the foot. He testified that the bullet that hit him came from a passing taxicab. He could not tell how many persons were firing from the cab. He did not see who was firing the guns.

Epton identified a written and signed statement that he gave to Javan Deloney's attorney. He acknowledged making and signing the statement but testified that he did so because he was being threatened by certain people around his house. In the statement, Epton said that defendant was the only person he could positively identify. He saw defendant in the back passenger side of the car. Epton said that he signed the statement because he was young and scared and did not know what people could do to him; he was being pressured by other Gangster Disciples.

On cross-examination, Epton testified that on the night of the shooting he was speaking to Hall through her passenger side window. He did not go around to the driver's side. After speaking to Hall, he walked towards the restaurant. He heard a car and shots being fired from the car. He turned around and looked towards Hall's car and saw her grabbing her baby and going to the floor of the car. Epton testified that the taxicab was moving quickly. By the time Epton looked up again, Hall was gone. Epton reiterated that, contrary to his written state-

ment, he did not see defendant in the taxicab. It was too dark to see anyone.

Epton testified that, when the police first came to visit him in the hospital, he told them he could not identify anyone in the taxicab. The next time the police came back, they told him that the shooters were Black Disciples. Epton then gave them the names Pete Deloney, Tojo, and Ollie, persons he knew to be Black Disciples. He did not mention defendant, although he knew who defendant was. When the police came back with some photographs, they stopped at defendant's picture and said "this is him, this is him right here." Epton told them that he knew the person in the picture.

At the time of trial, Epton was serving a six-year sentence for armed violence. While incarcerated at the county jail, Epton was taken two or three times to the State's Attorney's office. On those occasions, he told Smith that he did not see who did the shooting. Although he declined to cooperate, Epton still received the minimum sentence.

The parties entered into a stipulation regarding Epton's written statement. The parties stipulated that if Sheila Hanley, a witness to the statement, were called, she would testify that she had a conversation with Epton in July 1992. Epton told her that defendant was the only person he could positively identify.

## Defense

Defendant presented his case by way of stipulation. The parties stipulated that Detective Tony Maslanka would testify that he interviewed Dewitt Watkins, who observed the shootings from a residence on Peoria Street. Watkins said that he saw shots coming from the rear of the cab and did not see shots coming from the front. Maslanka also spoke to Marcus Taylor. Taylor told him he was not going to make any identifications but would supply information. Taylor said that the rear passenger

of the cab rolled down his window and that the other backseat passenger got out of the car. Both of them began shooting. The person in the back of the car was a black male, and the person who got out of the car was a black male wearing a hood and baseball cap. Taylor did not see anyone in the front passenger seat of the cab. Maslanka also interviewed Cruthard, and Cruthard told him that, in addition to the shots fired from the car, a person might have been firing from a gangway across the street.

The parties stipulated that if Assistant State's Attorney William Marback were called to testify, he would testify that he interviewed Cruthard on June 8, 1993. Cruthard told him that the occupants of the cab began firing when the cab was still three houses away. During this interview, Cruthard acknowledged that the State's Attorney's office agreed at his request that he be sent to an institution other than Stateville or Pontiac to serve his sentence for possession of a controlled substance with the intent to deliver. Following closing arguments, the court found defendant guilty as charged in the indictment.

## POST-TRIAL MOTION

Defendant moved for a new trial based upon an allegation that Jerome (Marcus) Taylor had recanted his trial testimony. At a hearing on the motion, Taylor testified that he did not tell the truth during defendant's trial when he said he saw defendant in the taxicab. He also was not telling the truth when he said that he had not been shown photographs of defendant. Taylor testified that at a meeting with Mike Smith and Detective Kill he was shown two photographs of defendant after he said he could not identify anyone. Detective Kill said "this is the guy that killed your cousin." Taylor said that he knew defendant but that he would not testify that defendant did the shooting. Detective Kill said that he would lock Taylor up if he did not testify, so Taylor agreed to

testify. They then rehearsed what Taylor would say, and Taylor gave a statement to a court reporter.

Taylor also went to the State's Attorney's office on the day he testified at trial. Detective Kill picked him up at his house and took him there. Taylor told the assistant State's Attorneys that he was not going to testify. One of them asked Taylor if "they" had gotten to him, and Taylor said "no" and the reason he was not going to testify was that he had not seen anything. According to Taylor, the assistant State's Attorney then said, "What, you just going to let the bastard go that killed your cousin?" The assistant State's Attorney then told him that what he said would come out one way or another and that he would have him held in contempt of court and jailed for six months if he did not testify. Detective Kill told Taylor that he would protect him. Taylor was then shown three pictures of defendant. Two were the same ones he had already seen, and a third was a mug shot of defendant.

Taylor testified that he was not telling the truth when he identified defendant at trial. He explained that he could not see anyone when the shots were fired because he was lying facedown. The only reason he testified otherwise was that he was scared. His recantation was not the result of any threats or promises.

On cross-examination, Taylor was initially asked if he came to court with a man who was sitting in the back row and wearing a gold star and an emblem around his neck. Taylor denied it. Taylor further admitted that there was currently a truce between the Gangster Disciples and the Black Disciples. Taylor was asked if it was true that, as part of gang truces, gang members changed testimony. Taylor said he did not know anything about that and that it was not the reason he changed his testimony. Taylor admitted that he was hiding from the police during the pendency of defendant's case.

Taylor denied that, on the day of the trial, he told Detective Kill to pick him up in something other than a squad car because he did not want the Black Disciples to know that he was testifying. He also denied telling Kill that he had been approached by a Black Disciple who told him, "If you testify, you're dead." Taylor testified that his aunt, Rhonda Bussle, was pressuring him to testify against defendant. Taylor was shown his signed statement and acknowledged that it said that he was not threatened or promised anything and that he was afraid of defendant and defendant's brother.

Taylor denied that he told his aunt that he was being forced to change his story. When he spoke to his aunt, she told him that the State's Attorney's office had called and wanted her to find out why Taylor was changing his story. Taylor told her that he was sorry his cousin was dead but that he did not see anything. Taylor testified that he understood that the penalty for perjury was one to three years' imprisonment, but explained that it was better than lying and getting someone the death penalty. The assistant State's Attorney asked that the record reflect that Taylor left the courtroom with the man he denied coming in with.

Rhonda Bussle testified that she told Taylor prior to April 1994 that he needed to talk to the State's Attorney because he told Bussle that he knew defendant committed the crime. Shortly before the case was supposed to be set for a sentencing hearing, Taylor went to Bussle and told her he was forced to change his story. Taylor told her that he was scared. Bussle was angry and told Taylor that he would not be "kin" to her anymore if he changed his story. She saw him in the courtroom on July 18, and he told her "they" brought him down there. Bussle spoke to Taylor again on September 22. He told her that he was being forced to go to court and that someone had given him money.

Detective Kill testified that when Taylor first gave his court-reported statement, he expressed fear that the Black Disciples would kill his girlfriend and his son. Kill assured him that he would be provided with protection and that, if necessary, his family would be moved. Kill picked Taylor up on the morning of his trial testimony and drove him to the courthouse. Taylor told him not to come in a police car because he was afraid he would be ambushed before he got to the car. On the way to the courthouse, Taylor told Kill that the Black Disciples contacted him the night before and told him they were not going to let him go to court. He told Kill that they were watching him on the street corner when he left. Kill was upset because Taylor had not told him that they were in the middle of an ambush. Following Kill's testimony, the court denied the motion for a new trial and stated that he would have found defendant guilty even if evidence of Taylor's recantation would have come out at trial.

## SENTENCING

The trial judge sentenced defendant to death. However, it was later determined that defendant had not waived a jury for purposes of sentencing, and defendant was given a new sentencing hearing in front of a jury. The jury found defendant eligible for the death penalty based on his being over 18 years of age and having committed two or more murders. In addition to the murders in this case, the jury received evidence that, in 1992, defendant was convicted of murdering Ralph Jackson.

At the aggravation/mitigation phase, much of the evidence the State presented duplicated the trial evidence. We will summarize only the additional evidence. The State first presented evidence regarding Jackson's murder. A witness testified to seeing two men engaged in a fistfight in front of a restaurant. She then saw defendant jump out from around the side of the restaurant. Defen-

dant began to fire a machine-gun-type weapon at the two men. One of the men got up and started to run away. Defendant fired three to five shots at the victim, Ralph Jackson, who had his back turned to defendant and was fleeing. Jackson died shortly thereafter. The police could not locate defendant for a year after the murder. They finally arrested him at an apartment. Another man answered the door, and the police saw defendant running to the rear of the apartment. Defendant jumped out of an upstairs window and was arrested. The police found on the ground next to defendant a bag containing 174 packages of cocaine. In defendant's bedroom, they found two pistols: a 9-millimeter semiautomatic and a .38-caliber Taurus. Defendant was arrested, but posted the $250,000 bond. Defendant was convicted and sentenced to 40 years' imprisonment for that murder.

Officer Thomas Richardson, who participated in defendant's arrest for the Jackson murder, testified about tattoos that defendant has on his body. Defendant has a tattoo of a grim reaper with "BDN" written under it on his upper chest. "BDN" stands for Black Disciple Nation. On defendant's left arm is a tattoo of a devil holding up three fingers. The three fingers signify membership in the Black Disciples. On defendant's back is a tattoo of a bulldog firing a semiautomatic weapon with one hand and holding a bag with the other. This tattoo symbolizes the Black Disciples' willingness to use violence to protect their property.

Officer Dennis Collum testified that he arrested defendant in connection with the Peoria and 71st Street shootings. Collum searched defendant and recovered a sum of money. Defendant told them that it was $1,231 and that he got the money from selling drugs. He told the police to hurry up and process him because he could make whatever bond would be set. He bragged to the police about his new $30,000 Cadillac. When they asked if

he paid cash for it, he smiled. A drug-sniffing dog reacted to the money in such a way as to indicate that the money had cocaine on it.

The State also presented evidence of defendant's behavior while incarcerated. Three employees of the Cook County Department of Corrections—Captain James Hatcher, Officer Darren Angel, and Officer Michael Myers—testified about defendant's participation in a riot in the maximum security unit of the Cook County jail on August 15, 1993. The riot started when officers tried to transfer an inmate whom defendant did not want moved. The riot continued for nearly two hours before the executive director gave the order to retake the tier.

The inmates prepared themselves for combat by using soapy water to make the floors slippery, thus making it difficult for any staff members who tried to come in. They tore up furniture and made weapons from it, armed themselves with shanks, and had toilet bowl cleanser set aside to throw at the officers. They also used debris from the furniture to barricade the entrance to the tier. The inmates protected themselves by using towels, parts of foam rubber mattresses, and styrofoam to make headgear and padding. When the officers tried to get the inmates to return to their cells and not take part in the riot, defendant kept yelling to the inmates not to leave and that everyone should stand together. When inmates who did not want to be involved tried to leave the tier, defendant ordered other inmates to stop them. Hatcher and Angel testified that defendant was a leader of the riot.

Defendant was armed with a cut-off bottle and a 30-inch metal rod that turned out to be part of one of the tables from the day room. Hatcher tried to negotiate with defendant and explain why the inmate had to be transferred. Defendant said "fuck that" and told Hatcher to come in and do what he had to do, and the inmates would do what they had to do. After the order was given

to retake the tier, several staff members armed themselves with riot helmets, batons, and shields. As Hatcher tried to remove the barricade, defendant doused him with a chemical disinfectant. Chemicals were also poured on Angel, and he had to go to the hospital because of an asthma attack. When the executive director gave the order to retake the tier, defendant told the executive director that he would "make him his bitch" if he came into the tier.

Officer Myers was injured in the attack. Myers was the first officer to get through the barricade. After he got through, one inmate struck him in the leg with a bar, and another struck at his shield. The shield eventually disintegrated, and Myers thought he was going to die. He suffered severe bruising on his arm and thigh. Approximately 26 to 29 riot shields were damaged in the attack. After order was restored, defendant was given 29 days in segregation, the most serious penalty for an infraction at the jail.

On November 13, 1992, Officer David Zelig was escorting defendant to another location in the downstairs facility of the jail. Two other inmates were following closely behind them, and Zelig ordered them to stay back. Zelig ordered them two more times to stay back, and then extended his right hand. One of the inmates slapped Zelig's hand, and defendant grabbed Zelig from behind. All three of the inmates began to beat Zelig. Other officers came to Zelig's aid and subdued the inmates. Zelig was treated for ear bruising and head injuries. Defendant received 29 days in segregation for this incident.

Ronald Hinton, a compliance administrator for the Cook County Department of Corrections, testified about disciplinary actions taken against defendant. Hinton explained the disciplinary proceedings, which include hearings before an administrative board. If the allegations against an inmate are founded, the inmate can

receive anything from a verbal reprimand to 29 days in segregation.

Hinton recounted the following punishments that defendant received for disciplinary violations: 10 days in segregation when cocaine was found in his shoes; 29 days for assaulting Officer Zelig; 7 days for possessing marijuana; 29 days for participating in the riot; 5 days for disrespectful and abusive language; 7 days for fighting with an inmate; a verbal reprimand for refusing to stand count; 7 days for using obscene language and refusing to "lock up" and get off the phone; and 7 days for possessing an unknown substance.

The State also presented evidence of problems defendant caused after he was transferred to the Joliet Correctional Center. William Doyle, superintendent of the reception and classification unit, testified that on December 20, 1993, he was observing the inmates returning from the dining hall. Some of them refused to move towards the cell house, and two individuals began to incite the group that was not moving. Doyle had those two cuffed, and the group started to move. Other inmates began to fight with the staff. One of the staff members was being assaulted, and a warning shot was fired to disperse the group. Doyle spoke to defendant because he had been identified as a leader in the incident. Defendant was uncooperative and told Doyle to enjoy his life because it was going to be short. Defendant repeated this several times and would not make any other statements.

Officer Samuel Nance also testified about this incident. On December 20, 1993, Nance was assigned to move prisoners from the dining hall. Two inmates were cuffed, and Nance moved a group of 15 inmates into the cellblock. As the group climbed the stairs, defendant moved ahead of Nance. He then met Nance on the stairs and said that a group of them were going outside. There were five to seven inmates behind defendant. Nance

ordered them upstairs, and defendant refused and shoved Nance backwards. Nance then sprayed the group with mace, and the inmates ran back upstairs. Nance then handcuffed defendant and took him to the superintendent's office. On the way, defendant told other inmates to yell if anyone was locked up or not returned to his cell. Defendant threatened that the inmates were going to "rock this place" if anyone was locked up.

James Utley, a records office supervisor for the Department of Corrections, testified that defendant had committed nine disciplinary violations while in the Department of Corrections, and they were all classified as major violations. On December 4, 1993, defendant started a fire on the back of the toilet in his cell. The fire alarms went off four times. Defendant's cell was searched, and officers found pillows with gang writing on them. The officers also found papers containing Department facility locations, their classifications, and the days they transfer prisoners. This information was classified and confidential, and it would be a security risk for an inmate to have access to it. Defendant was demoted to Grade B status for two months and was denied commissary privileges for two months.

Defendant's other disciplinary violations and punishments were as follows: a reprimand for failing to return to his quarters after a meal; a reprimand for wearing clothing that indicated he resided in a different cell house; three months' segregation and demotion to Grade C status for throwing burning objects into the gallery; one year of segregation and one year of good-time credit revoked for assaulting a person and causing a gang disturbance; two months' demotion to Grade C status for refusing to be strip searched; three months' segregation and a three-month demotion to Grade C status for sexual misconduct in the visiting room; and successive 15 days' segregation and three month demotions to Grade C status for refusing to be strip searched.

Utley was asked about the differences in treatment for death row inmates and inmates who receive life sentences. Utley testified that death row inmates are in their cells 23 hours a day, and are only released for showers and regular recreation. They are sent to either the Pontiac or Menard condemned unit. Any time a death row inmate is moved from his cell, he is chained and escorted by a minimum of two staff members. By contrast, inmates who receive life sentences could go to either maximum or medium security facilities and enjoy the same benefits as other inmates. Inmates who receive natural life are the toughest to deal with because they do not have any good-time credit to lose. Utley testified that an inmate sentenced to natural life could also be segregated for 23 hours a day if he violated certain rules.

Defendant presented the following evidence in mitigation. Marcus Lyles, a superintendent at the Cook County jail, testified that defendant needed medical attention after the riot of August 15, 1993. According to Lyles, when there is an incident such as the August 15 riot, it is typical for everyone on the tier to be disciplined. On cross-examination, Lyles testified that defendant appeared to have a leadership role in the riot and was passing out instructions to other detainees.

Sergeant Joseph Knowles of the Cook County Department of Corrections testified that he believed that Lawrence Jackson and Andre Archer were the leaders of the August 15, 1993, riot. On cross-examination, Knowles acknowledged that he was not up on the tier for the entire altercation but rather left to prepare the tactical units. Knowles was not present when other officers negotiated with the inmates.

Defendant's aunt, Davannah Lawrence, testified that defendant interacted well with her children. She never saw defendant exhibit any violent behavior. Lawrence saw defendant almost every day and observed that he

was considerate, helpful, and got along with everybody. Lawrence is a nurse who works in a program called Operation Fresh Start. The purpose of the program is to remove gang tattoos from people who want to make a fresh start. She never had anyone ask to have Tasmanian devil or grim reaper tattoos removed because of their gang significance.

Glenda Smith testified that she is related to defendant by marriage. Smith's sister-in-law is defendant's aunt, and Smith's late husband was defendant's cousin. Smith never observed defendant being violent in any way. Defendant got along well with his friends and family. Defendant stayed with Smith for a while, and she never saw him with any weapons. Smith never saw any grim reaper, bulldog, or Tasmanian devil tattoos on defendant.

Kerri Williams testified that defendant is the father of her four-year-old daughter. She dated defendant for approximately two years. Defendant treated her very well and was nice to her. She never saw him angry or violent with her or with anyone else. She never saw any tattoos on defendant.

Defendant's cousin, LaTonya Lawrence, testified that she knew members of both the Gangster Disciples and the Black Disciples. She was familiar with the types of tattoos that Black Disciples have. They typically had stars and "treys" on their arms or legs. They also would have the roman numeral three, and "two four," which signified the second and fourth letters of the alphabet. She did not see the tattoo on defendant's back until after he went to jail. Lawrence never knew defendant to be violent.

Defendant's mother, Zelda Brooks, testified that defendant received As and Bs in grammar school, and also received good grades in high school. Defendant got along well with his four siblings and with other children in the

neighborhood. When he was growing up, defendant liked sports, skating, and Bible study.

The parties stipulated to the following evidence: James Russell of Jiffy Cab Company would testify that the rear window of the cab used in the shooting rolls down only halfway; Officer N. Diciolla of the Chicago police department would testify that on September 6, 1991, Epton, Hall, and Scott came to the State's Attorney's office and tendered firearms evidence; and that photographs showing defendant with tattoos were taken on June 25, 1996.

The jury found no mitigating factors sufficient to preclude the imposition of the death penalty.

## ANALYSIS

### Motions to Suppress Identifications

Defendant raises nine issues for our consideration. We first address defendant's contention that the court erred in failing to rule on one of his motions to suppress identifications and in denying the other two for the reason that suggestive procedures go to weight, not admissibility. We address this issue together with defendant's argument that the identifications by Epton, Hall, and Cruthard were inadmissible because they resulted from suggestive identification procedures.

### Allen Epton

The trial court agreed with the prosecution that it did not have to rule on the motion to suppress Epton's identification because Epton denied making an identification. Defendant contended that the court had to rule on the motion because the police testified that Epton identified him. Defendant reasoned that, if the police were going to testify that Epton made an identification, then the court would have to rule on whether the identification procedures were suggestive. The trial judge believed that it was a question of fact.

As defendant suspected, Epton's identification of him was admitted at trial. However, it was not through the officers' testimony. The only evidence of Epton's identification of defendant was introduced by way of the statement that Epton gave to Javan Deloney's attorney. In his motion to suppress, defendant asked the court to suppress "any testimony concerning a certain photographic identification, a certain line-up identification, as well as the in court identification of the defendant at the time of trial, all by one Allen Epton." No evidence that Epton picked defendant out of a photographic lineup or a live lineup was introduced at trial. Although Epton identified defendant in court, he did not identify him as a shooter. Because none of the evidence defendant moved to suppress was introduced at his trial, any failure of the court to rule on the motion was harmless.

As previously stated, the only evidence that Epton identified defendant as a shooter came in by way of the statement Epton gave to Javan Deloney's attorney. The State concedes that this statement was admitted as substantive evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1996)). The problem defendant faces is that he never moved to suppress this statement. This statement was independent of the alleged photographic identification that defendant identified in the motion to suppress. Epton does not state that he picked defendant out of a photographic lineup because he was told to do so by the police. Rather, he unequivocally states that he saw defendant in the back passenger seat of the cab and that defendant was the only person he could identify. This statement was not covered by defendant's motion to suppress, and defendant did not move to suppress it when it was introduced. A defendant who does not move to suppress an identification waives the right to argue that the identification was the result of suggestive procedures.

*People v. Pierce*, 52 Ill. 2d 7, 10 (1972); see *People v. Campbell*, 115 Ill. App. 3d 631, 634 (1983). Accordingly, defendant has waived his right to argue that Epton's statement to Javan Deloney's attorney was tainted by previous suggestive identification procedures.

### Brenda Hall and George Cruthard

With respect to the motion to suppress Hall's and Cruthard's identifications, defendant argues that the court applied an incorrect legal standard and asks that we remand the cause to the trial court for further proceedings on his motion. After the trial judge said that he was denying the motion to suppress Hall's and Cruthard's identifications, defendant's attorney tried to explain that, at least with respect to Cruthard, there was clear, unrebutted evidence that the police used suggestive procedures. The trial judge then stated, "Goes to weight, not admissibility. It will be denied." We agree with defendant that the trial judge's statement of the law was erroneous. In *People v. Blumenshine*, 42 Ill. 2d 508, 511-12 (1969), this court held that suggestive identification procedures affect the admissibility rather than the weight of identification testimony and overruled prior decisions that suggested to the contrary. See also *Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967); *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967).

Nevertheless, we disagree with defendant's suggestion that we should remand the cause to the trial court for further proceedings. The defendant has the burden to show that a pretrial identification was impermissibly suggestive. *People v. Enis*, 163 Ill. 2d 367, 398 (1994). The State may then overcome this showing by clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident. *Enis*, 163 Ill. 2d at 398. With respect to Hall, it is clear defendant did not meet his burden of

showing suggestiveness. Defense counsel did not elicit any testimony from Hall that would indicate that the police used suggestive procedures. Defense counsel seemed to concede this, because after the court said that the motion would be denied, defense counsel began to argue only with respect to Cruthard.

On appeal, the evidence upon which defendant relies to say that the police used suggestive identification procedures with Hall was evidence that came out at *trial*. Hall testified at trial both that she did and did not see the names on the backs of the photos. Defendant argues that, in ruling on the trial court's decision on a motion to suppress, the reviewing court can consider evidence introduced at trial as well as at the suppression hearing. Defendant cites *People v. Braden*, 34 Ill. 2d 516, 520 (1966), and *People v. Reese*, 92 Ill. App. 3d 1112, 1113-14 (1981), for this proposition. See also *People v. Kidd*, 175 Ill. 2d 1, 25 (1996). However, in these cases, the courts relied on trial testimony to *affirm* the trial court's denial of a motion to suppress. Defendant is asking us to *overturn* the trial court's ruling on the motion to suppress based on evidence that came out at trial.

The analysis is different in this situation. When a reviewing court affirms a trial court's suppression ruling based on evidence that came out at trial, it is akin to a harmless error analysis. The reviewing court is essentially saying that whether the court's decision was supported by sufficient evidence at the suppression hearing becomes irrelevant when evidence to support the trial court's decision is introduced at trial. One reason this is so is that the pretrial ruling on a motion to suppress is not final and may be changed or reversed at any time prior to final judgment. See *People v. Caballero*, 102 Ill. 2d 23, 35-36 (1984). We do not believe that this reasoning applies equally when a defendant is asking us to rely upon trial evidence to reverse a trial court's decision

on a pretrial suppression ruling, particularly when the defendant fails to object when the relevant evidence is introduced. Clearly, no evidence of suggestive procedures with respect to Hall was introduced at the pretrial hearing. When Hall testified at trial that she saw the names on the backs of the photos, defense counsel should have asked the court to reconsider its decision on the motion to suppress. As stated, that decision remained subject to change until final judgment. By not asking the court to reconsider its ruling on the motion to suppress when that evidence was introduced at trial, defendant has waived his right to argue it on appeal. Moreover, even considering the trial testimony, defendant did not make out a *prima facie* case of suggestiveness with respect to Hall. Hall's testimony on whether she saw the names was equivocal, and she also testified that she had never heard the name "Terrence Brooks" before she saw the pictures.

In addition to trial testimony, defendant relies upon evidence about which he is arguing for the first time on appeal. Defendant argues that, in the photos shown to Hall, the arrest dates are prominently displayed on placards hung around the individuals' necks. The date on defendant's placard is August 15, 1991, eight days after the shooting. Hall was never questioned about the dates on the photos, and defendant never made this argument in the trial court. Defendant cites no authority for the proposition that a court can consider evidence argued for the first time on appeal in considering a trial court's ruling on a motion to suppress. To be reviewed on appeal, evidence must have been presented to the fact finder at trial (*People v. Steidl*, 142 Ill. 2d 204, 226 (1991)), and arguments made for the first time on appeal are waived (*People v. Page*, 156 Ill. 2d 258, 275 (1993)).

With respect to Cruthard, defendant did make a *prima facie* case that the police used suggestive identifica-

tion procedures. Cruthard testified at the hearing on the motion to suppress that Assistant State's Attorney Michael Smith told him several times, before showing him any pictures, that defendant was the one who shot him. Accordingly, the burden then shifted to the State to show an independent basis for Cruthard's identification. The State did not call Smith to rebut Cruthard's testimony. Absent a showing of an independent basis, the court should have granted the motion to suppress Cruthard's identification. Defendant requests that we remand this cause to the trial court for a hearing on whether there was an independent basis for Cruthard's identification of defendant.

We decline defendant's suggestion to remand this matter to the circuit court for further proceedings on the motion to suppress. The independent basis determination can be made by a reviewing court where the record permits an informed judgment. *People v. Curtis*, 113 Ill. 2d 136, 147 (1986). If the reviewing court cannot reach an informed judgment as to whether the identification had an independent origin, the conviction will be vacated pending a hearing in the trial court to allow the State to prove an independent origin. *People v. Blumenshine*, 42 Ill. 2d 508, 513 (1969). Here, Cruthard's testimony at the hearing and at trial provides a sufficiently complete recounting of the events of the shooting for us to make an informed judgment on whether his identification of defendant had an independent basis.

In determining whether an identification has an independent origin, we consider the following factors: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the level of certainty demonstrated by the witness at the suggestive confrontation; and (5) the length of time between the offense and the suggestive

confrontation. *Enis*, 163 Ill. 2d at 398. We also consider whether the witness was acquainted with the suspect before the crime, and whether there was any pressure on the witness to make a certain identification. *People v. Bryant*, 94 Ill. 2d 514, 521 (1983).

Cruthard's trial testimony shows an independent basis for his identification of defendant. Cruthard testified that, although the lights in the cab were off, the street lights on the corner were lit. The cars were moving slowly, and the cab was only five or six yards away when the shooting started. Although the shooting was going on for only "a second or so" before Cruthard dove on top of Taylor, Cruthard could see that Ivan Smith was driving the cab and defendant was in the backseat, leaning forward toward the door. Thus, the evidence showed that Cruthard had an adequate opportunity to view the assailant.

The level of certainty demonstrated also favors admission. Once Cruthard decided to speak to the police, the record does not demonstrate any hesitation in his identifying defendant.

Perhaps the strongest factor weighing in favor of admission is that Cruthard was acquainted with defendant before the crime. Cruthard had known defendant for approximately four years and knew that he was a member of the Black Disciples. This is particularly important because it renders the other factors less relevant. See *People v. Robinson*, 42 Ill. 2d 371, 375-76 (1969) (stressing the importance of a witness' prior acquaintance with the person identified). Even if the conditions for viewing the perpetrators are less than ideal, when a witness sees the face of someone he knows, it is less suspicious when he identifies that person 22 months later than if he sees the face of a complete stranger and tries to identify that person 22 months later. If Cruthard knew defendant and saw his face in the cab, the police's sug-

gestive procedures would have been largely irrelevant. See *Robinson*, 42 Ill. 2d at 375-76. Cruthard explained his 22-month silence by saying that he did not originally tell the police who was involved because he did not want the police to arrest him and that he was worried about himself and his family.

We do not consider the factor of Cruthard's prior description, because he did not make one. Cruthard was not shown the pictures and asked to identify the offenders. There are two versions of what happened. Either Cruthard told the police who was involved and then picked out their pictures, or Michael Smith told Cruthard who was involved, and Cruthard then picked out their pictures. Either way, Cruthard did not make a general prior description of the perpetrators.

The factor of Cruthard's degree of attention weighs against admissibility. Cruthard testified that, although he noticed the windows being rolled down, he did not see who was doing that because he was not paying attention. It appears that Cruthard did not pay close attention to the cab until the shooting started, and at that point he quickly dove on top of Taylor to protect him. The length of time between the offense and the suggestive procedure also does not favor admission. Although the length of time between the offense and the suggestive procedure was not long, the relevant time period here is the length of time between the offense and Cruthard's identification. Cruthard did not identify defendant until 22 months after the shooting. Finally, the factor of whether the witness was under any pressure to make a certain identification also weighs against admission. There was testimony at the hearing on the motion to suppress that Assistant State's Attorney Michael Smith kept telling Cruthard that he knew defendant shot him. Further, the record shows that Cruthard gave the statement to the police after he lost the motion to suppress in his narcotics case.

He received a light sentence for the amount of drugs involved, and received a recommendation that he would not be sent to Stateville or Pontiac.

The shortcomings of Cruthard's testimony notwithstanding, we believe the record demonstrates an independent basis for Cruthard's identification. Three factors weigh in favor of admission, and three weigh against admission. However, we cannot overstate the importance of Cruthard's knowing defendant before the incident. We believe the record adequately shows that Cruthard's identification was based on what he saw on the night of the shooting rather than on any suggestive procedures employed by the police.

### Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to establish his guilt beyond a reasonable doubt. We disagree. When a defendant challenges the sufficiency of the evidence supporting his conviction, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the trier of fact's responsibility to determine the witnesses' credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence; we will not substitute our judgment for that of the trier of fact on these matters. *People v. McDonald*, 168 Ill. 2d 420, 448-49 (1995).

Defendant was convicted based upon the statements of four eyewitnesses. He points out that two of these witnesses, Epton and Taylor, later recanted their identifications. It is well settled that the recantation of testimony is generally regarded as unreliable, and it is for the trier of fact to determine the credibility of the recantation testimony. *People v. Fields*, 135 Ill. 2d 18, 43 (1990).

Taylor's recantation was made under suspicious circumstances. We note that Taylor's aunt testified that Taylor told her that he was being forced to change his testimony. Further, Taylor's recantation came during a truce between the Gangster Disciples and the Black Disciples. When Taylor recanted his statement, he denied that he came to court with a man seated in the back row, but later left the courtroom with that man. Finally, Detective Kill's testimony showed that Taylor was being threatened by the Black Disciples when he gave his original statement. We do not believe that the trier of fact was required to believe Taylor's recantation testimony rather than his trial testimony.

Regarding Epton, there are two different versions of what he saw: his trial testimony, in which he said that he did not see who did the shooting, and the statement he gave to Javan Deloney's attorney, in which he said that defendant was the only person he could identify. It was for the trier of fact to determine which of these versions to believe. Viewing the evidence in the light most favorable to the State, we believe the trier of fact could have reasonably believed that the statement Epton gave that implicated defendant was truthful and that its subsequent recantation was untruthful. Defendant has not given us any persuasive reason to substitute our judgment for that of the trial judge on this matter.

Defendant also argues that the accounts given by the witnesses conflicted in some respects. However, the record shows that the witnesses' statements varied only in minor respects, which is to be expected anytime several persons witness the same event under traumatic circumstances. See *People v. Rodriquez*, 100 Ill. App. 3d 244, 248 (1981) (holding that conflicts in testimony did not create a reasonable doubt of guilt and that it was unrealistic for witnesses to a sudden, violent event to describe the event with perfect accuracy). Their statements

were generally consistent in regard to how the event unfolded, the taxicab being involved, defendant being on the passenger side of the cab, and the gunfire coming from the passenger side. There were discrepancies as to how many cars were involved, whether defendant was in the front or the rear passenger seat, whether the cab's sign was lit, and whether anyone was leaning out of the cab. However, we do not believe these discrepancies were such that a rational trier of fact could not have found defendant guilty beyond a reasonable doubt.

In challenging the sufficiency of the evidence, defendant also argues with respect to the suggestiveness of the identification procedures used. Defendant further argues with respect to the reliability factors, and argues that the witnesses did not have a good opportunity to view the offenders, there was a considerable length of time between the offense and the identifications, and the witnesses were under pressure to make a certain identification. However, these arguments are better directed toward the admissibility of the statements. As stated in the previous discussion, defendant waived his right to challenge the admissibility of Hall's and Epton's statements. With respect to Cruthard, we have already determined that his identification was sufficiently reliable because it had an independent origin. Once the statements are determined to be admissible, our standard of review is limited to the *Collins* standard of determining whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found defendant guilty beyond a reasonable doubt. See *Enis*, 163 Ill. 2d at 398-400. Four eyewitnesses testified to seeing defendant in the taxicab, and two of them saw him shooting. Any issues involving their credibility were for the trial judge to resolve. Viewing the evidence in the light most favorable to the State, we believe that a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

## Sentencing Issues

Defendant raises four issues with respect to his sentencing hearing. He first argues that Utley's testimony that defendants who receive life sentences are more dangerous, have more movement and privileges, and may go to less secure prisons was irrelevant and unreliable. Defendant argues that this testimony focused the jury's attention on speculation of future crimes rather than on defendant's history.

Defendant concedes that he has waived review of this issue. Defendant did not object to this testimony when it was given, nor did he raise this issue in his post-sentencing motion. The closest defendant came to mentioning it in his post-sentencing motion was when he stated that it was improper to allow Utley to testify as to "possible assignment of defendant if not sentenced to death as it is speculative." In any event, a defendant must both contemporaneously object to the allegedly improper evidence and raise the issue in the post-sentencing motion to preserve it for appeal. *People v. Williams*, 181 Ill. 2d 297, 322 (1998). Defendant argues that we should review this issue as plain error under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) or, alternatively, in the context that his attorney's failure to object to this evidence amounted to the ineffective assistance of counsel. The plain error exception is properly applied when the evidence is closely balanced, or when the error is so substantial that it denied the defendant a fair proceeding (*People v. Mahaffey*, 166 Ill. 2d 1, 27 (1995)) and remedying the error is necessary to preserve the integrity and reputation of the judicial process (*People v. Herrett*, 137 Ill. 2d 195, 214 (1990)).

Defendant claims that this error occurred in the context of "a close question as to the appropriateness of the death penalty." We disagree with defendant's assessment of the evidence. The evidence in aggravation overwhelmingly outweighed the evidence in mitigation.

In aggravation, the jury heard evidence of defendant's participation in four violent murders. Further, the jury heard evidence of the serious disciplinary problems defendant has caused while incarcerated, including starting fires, attacking prison and jail authorities, and inciting riots. In mitigation, defendant presented evidence from friends and family members that he was nonviolent and got along well with others. We reject any contention that the aggravating evidence against defendant was anything but overwhelming.

We also decline to review this claim under the second prong of the plain error analysis, which allows us to notice errors that are so fundamental as to deny the defendant a fair proceeding. This prong of the plain error rule is invoked only if the error is so fundamental to the integrity of the judicial process and so prejudicial to the defendant that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error. *People v. Vargas*, 174 Ill. 2d 355, 363-64 (1996); *Herrett*, 137 Ill. 2d at 215. Defendant argues that the complained-of evidence was irrelevant. Assuming this testimony was irrelevant, the trial court could have cured the error by way of sustaining a timely objection and instructing the jury to disregard the testimony. Accordingly, this alleged error is not cognizable under the second prong of the plain error rule.

Defendant also claims that he received the ineffective assistance of counsel because his attorney failed to object to Utley's testimony. Defendant's argument on this issue consists of three sentences and a cite to *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing professional norms, and (2) that the deficient

performance so prejudiced the defendant as to deny him a fair trial. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064-65. It is often easier to dispose of an ineffectiveness claim based on the second prong of the test—lack of prejudice—and counsel's performance need not be evaluated if it can be shown that the defendant suffered no prejudice. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). To meet the second prong of the test, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Defendant has not demonstrated a reasonable probability that, but for the omission of this evidence, the result of the sentencing hearing would have been different. As stated, the aggravating evidence against defendant was overwhelming. Defendant has not shown that he received the ineffective assistance of counsel.

Defendant next argues that the trial court misled the jury when it gave an incomplete answer to a jury question. During their deliberations, the jurors sent out the following question:

"Question, need further clarification. Natural life in prison without parole, does it mean that he will always spend 23 hours in segregation or solitary confinement? Or is that just on death row?"

After consulting with the attorneys, the trial judge sent the jury this response: "According to Jim Utley's testimony today, death row inmates spend 23 hours in segregation." Defense counsel had argued that the court should not answer the question but instead should have told the jury to continue to deliberate. Defense counsel agreed that the court's answer was accurate, but argued that it emphasized certain evidence over other evidence. Defendant argues on appeal that the court should have also reminded the jury that Utley testified that inmates

sentenced to life in prison could also be segregated 23 hours a day if they violated certain rules. According to defendant, the court emphasized the aggravating testimony and left out the mitigating testimony.

The trial court has a duty to provide instruction to the jury when the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. *People v. Reid*, 136 Ill. 2d 27, 39 (1990). However, when the jury raises a factual question, the decision of whether to answer the question is within the trial court's discretion. *People v. Childs*, 159 Ill. 2d 217, 228 (1994). Here, the jury's question was factual, so whether or not to answer was in the trial court's discretion.

We hold that the trial court did not abuse its discretion in giving the answer it did. The trial judge accurately repeated Utley's testimony, which the jury heard earlier that day. Defendant's attorney agreed that the trial court's response was accurate. Defendant contends that the jury should have been reminded that natural life inmates could also be segregated 23 hours a day. However, the jury asked if inmates sentenced to natural life imprisonment are *always* segregated 23 hours a day not whether they *could be* segregated 23 hours a day. The trial judge accurately repeated Utley's testimony by telling the jury that death row inmates spend 23 hours in segregation. We disagree with defendant that the trial court failed to repeat mitigating evidence to the jury. We fail to see how reminding the jury that natural life inmates could also be segregated 23 hours a day for up to one year if they violated certain rules could have been helpful to defendant. Further, that response would not have answered the question posed by the jury. The trial court's response to the jury's question was not an abuse of its discretion.

Defendant next argues that his right to be present at

a critical stage of the death penalty hearing was violated when the court considered the jury's question in his absence. A criminal defendant has a constitutional right to a public trial and to appear and participate in person and by counsel at all proceedings involving his substantial rights. Ill. Const. 1970, art. I, § 8; *McDonald*, 168 Ill. 2d at 459; *Childs*, 159 Ill. 2d at 227. A communication between the judge and the jury after the jury has retired to deliberate, except one held in open court and in the defendant's presence, deprives the defendant of those fundamental rights. *McDonald*, 168 Ill. 2d at 459; *Childs*, 159 Ill. 2d at 227.

It is unclear from the record whether defendant was actually absent when the court answered the jury's question. The trial judge remarked that all counsel were present, but did not mention whether or not defendant was there. However, assuming defendant was not there, we still find no reversible error. We will not reverse on the basis of an improper communication between judge and jury where it is apparent that no injury or prejudice resulted to the defendant. *McDonald*, 168 Ill. 2d at 460; *Childs*, 159 Ill. 2d at 227-28. The burden is on the State to show that any error in the judge's answering the question was harmless beyond a reasonable doubt. *McDonald*, 168 Ill. 2d at 460; *Childs*, 159 Ill. 2d at 228.

Defendant argues that he was prejudiced because, if he would have been present, he could have reminded the court and his counsel that natural life inmates may be in segregation 23 hours a day, and requested the inclusion of that fact in the court's answer. However, we believe the State met its burden of showing that any error in answering the question in defendant's absence was harmless beyond a reasonable doubt. As previously stated, the court gave an accurate response to the jury's question. Further, defendant's attorney raised the same concern that defendant claimed he could have raised. Defense

counsel told the court that its answer highlighted some evidence over other evidence and, when the court proposed to tell the jury that only death row inmates spend 23 hours in segregation, defense counsel objected to the use of the word "only" because that was not accurate. The court agreed to leave out the word "only." Accordingly, defense counsel expressed the concerns that defendant claimed he could have expressed if he had been present. Defendant suffered no prejudice, and any error in the communication with the jury without defendant present was harmless beyond a reasonable doubt.

Defendant's final argument with respect to his sentencing hearing is that the court erred in admitting into evidence four autopsy photographs of Gregory Archibald. This argument is waived. Defendant objected to the admission of only three of the four photographs and he did not raise the issue in his post-sentencing motion. Sentencing issues not raised in a post-sentencing motion are waived on appeal. *People v. Reed*, 177 Ill. 2d 389, 393-94 (1997). Defendant argues that we should review this issue as plain error. We disagree. As previously stated, the evidence at the sentencing hearing was not closely balanced. Further, any error in admitting these photographs was not so substantial that it denied the defendant a fair proceeding, and remedying the error is not necessary to preserve the integrity and reputation of the judicial process. We will not review this issue under the plain error standard.

Alternatively, defendant argues that he received the ineffective assistance of counsel when his attorney failed to raise this issue in the post-sentencing motion. However, defendant has not shown a reasonable probability that the result of the sentencing proceeding would have been different had the jury not seen the autopsy photographs. In fact, the only way defendant argues he was

prejudiced is that he must now meet a higher standard of review in this court. That is not the test. To show prejudice under *Strickland*, a defendant must show that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Defendant has not made that showing. The evidence in aggravation was overwhelming, and defendant has not demonstrated a reasonable likelihood that the result would have been different absent the autopsy photographs.

Constitutionality of the Illinois Death Penalty Statute

Finally, defendant raises two constitutional challenges to the Illinois death penalty statute. Defendant argues the statute is unconstitutional because (1) innocent people will inevitably be executed; and (2) the use of the words "sufficient to preclude" (720 ILCS 5/9—1(g) (West 1996)) prevents meaningful consideration of mitigating evidence. We rejected the first argument in *People v. Bull*, 185 Ill. 2d 179, 211-20 (1998), and *People v. Brown*, 185 Ill. 2d 229, 260 (1998). We have also repeatedly rejected the second argument. See, *e.g.*, *Bull*, 185 Ill. 2d at 220; *Brown*, 185 Ill. 2d at 260-61; *People v. Burgess*, 176 Ill. 2d 289, 322 (1997); *People v. Munson*, 171 Ill. 2d 158, 203-05 (1996). Defendant has not provided us with any persuasive reasons to revisit these holdings.

## CONCLUSION

The judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, November 10, 1999, as the date on which the sentence of death entered in the circuit court is to be imposed. Defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1996)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Correc-

tions, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

*Judgment affirmed.*

CHIEF JUSTICE FREEMAN, specially concurring:

I concur in the disposition of today's case. I write separately, however, because I disagree with the majority's convoluted treatment of defendant's claim that the court erroneously denied his pretrial motion to suppress Brenda Hall's identification of him.

During the pretrial hearing on defendant's motion to suppress, Hall testified that she had identified defendant from a photo array shown to her by an assistant State's Attorney. According to Hall's testimony, no one at the State's Attorney's office said anything to her before she viewed the photographs. 187 Ill. 2d at 101. Defendant presented no further evidence regarding Hall's identification at the pretrial hearing, and the court denied his motion as noted by the majority. At trial, Hall testified for the first time that the name "Terry Brooks" appeared on the back of the photograph she had identified. She also indicated that she had seen the photographs two times before identifying defendant's photo.

Defendant now argues that the trial court erred in denying his motion to suppress Hall's identification. I agree with the majority that, at the pretrial hearing, defendant failed to meet his burden of showing suggestive procedures. 187 Ill. 2d at 126. On appeal, defendant also relies upon Hall's *trial* testimony, claiming it proves that the police used suggestive identification tactics. In considering this issue, the majority first embarks upon an analysis of when a reviewing court may or may not consider trial evidence in reviewing a pretrial motion to suppress. It subsequently concludes that we should not consider Hall's trial testimony in this case, "particularly" because defendant failed to seek reconsideration of his

motion to suppress at the time the testimony was introduced. 187 Ill. 2d at 127. Then, notwithstanding this conclusion, the majority proceeds to do exactly what it has just denounced, and reviews the suppression decision in light of Hall's testimony, ultimately deciding that, in any event, it fails to warrant reversal of the trial court's decision. 187 Ill. 2d at 127-28.

I would dispose of this issue simply by stating that defendant has waived his right to rely on Hall's trial testimony by failing to bring it to the attention of the trial court. It is fundamental that defendant, as the party bearing the initial burden of proof on a motion to suppress (*Enis*, 163 Ill. 2d at 398), must alert the trial court to any evidence which emerges in support of his motion. If the evidence indicates that suggestive tactics were used, the State may then attempt to overcome such a showing with clear and convincing proof that the witness had an independent recollection of defendant. *Enis*, 163 Ill. 2d at 398. At trial, however, defendant simply let Hall's testimony pass without renewing or seeking reconsideration of his pretrial motion to suppress, or even specifically raising the matter in his post-trial motion (see *People v. Coleman*, 129 Ill. 2d 321, 340-41 (1989); *People v. Evans*, 259 Ill. App. 3d 650, 654 (1994)). Clearly, he cannot now assert that testimony as a basis of error. Additionally, for this same reason, it is inappropriate for the majority to reach the merits of defendant's argument on this issue. Rather, if the majority is in fact holding the matter waived, any further analysis should follow the test set forth by this court in *People v. Enoch,* 122 Ill. 2d 176 (1988). See *People v. Terrell*, 185 Ill. 2d 467, 523-31 (1998) (Freeman, C.J., & McMorrow, J., specially concurring).

JUSTICES BILANDIC and McMORROW join in this special concurrence.

144

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Brooks' convictions should not be disturbed, but would set aside his sentence of death. For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), this state's present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Accordingly, we should vacate Brooks' death sentence, and he should be sentenced to a term of imprisonment. Ill. Rev. Stat. 1991, ch. 38, par. 9—1(j). Because Brooks has been found guilty of murdering more than one victim, the term of his imprisonment must be natural life. Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(1)(c).