DANIEL T. O'KEEFE, Plaintiff-Appellant and Cross-Appellee, v. ILLINOIS STATE POLICE MERIT BOARD *et al.*, Defendants-Appellees and Cross-Appellants.

First District (6th Division)   No. 1—98—3471

━━━━━━━━

Opinion filed May 26, 2000.

Paul D. Geiger, of Chicago, for appellant.

James E. Ryan, Attorney General, of Chicago (Paul Racette, Assistant Attorney General, of counsel), for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

On February 17, 1995, defendant, the Illinois State Police (ISP), indefinitely suspended plaintiff, Trooper Daniel O'Keefe, without pay and pending a termination proceeding before the Merit Board (Board) pursuant to section 14 of the State Police Act (the Act) (20 ILCS 2610/14 (West 1998)). On June 16, 1995, ISP filed a 10-count complaint before the Board, alleging various instances of misconduct by O'Keefe. On September 24, 1996, a hearing officer found that ISP had proven 9 of the 10 counts. On October 31, 1996, the Board unanimously adopted the hearing officer's findings and discharged O'Keefe. On review, the circuit court affirmed the Board in part and reversed in part. O'Keefe now appeals to this court, arguing that: (1) the hearing officer erred in denying his motion to suppress his statements to investigators and his drug-test results; and (2) that ISP's investigation violated a collective bargaining agreement. ISP cross-appeals, arguing that the circuit court erred in finding that O'Keefe was entitled to pay while the Board hearing was pending. We affirm.

## I. BACKGROUND

Paula Barrows testified at an evidence deposition that she is a special agent with the Federal Bureau of Investigation and that she formerly worked for ISP. Barrows further testified that, on February 17, 1995, she became involved in an investigation regarding O'Keefe. According to Barrows, an informant, John Hernandez, had been arrested on drug charges and told investigators that O'Keefe had been supplying him with confidential information in exchange for cocaine. Hernandez met with Barrows that same day and, according to Barrows, stated that he had been supplying O'Keefe with cocaine for over five years. In exchange for the cocaine, O'Keefe gave Hernandez confidential information relating to police code words, planned drug busts, and license plate information. According to Barrows, O'Keefe also gave Hernandez an "EPIC book." Barrows explained that an "EPIC book" contains intelligence information involving narcotics trafficking throughout the United States and probably the world, including information regarding current narcotics investigations.

To corroborate Hernandez' story, Barrows instructed Hernandez to call O'Keefe and ask him to run a particular license-plate number. Barrows and other investigators watched Hernandez dial O'Keefe's telephone number, saw O'Keefe's number appear on the display of

Hernandez' cellular telephone, and shared the telephone with investigators so that they could hear the conversation and identify O'Keefe's voice. Later that day, O'Keefe called back and provided the information Hernandez requested. Barrows verified through an ISP telecommunicator that, while O'Keefe was off duty that day, he had in fact called in a request for information regarding the same license-plate number. Also that day, Barrows and three other officers searched O'Keefe's squad car. Inside, they found several Penthouse magazines, individual photographs of a naked woman, and a set of brass knuckles. ISP prohibits troopers from having any such items in their patrol cars.

Arthur Sebek, a squad supervisor in the ISP internal investigations division, testified that he was also present when Hernandez called O'Keefe, that he could identify O'Keefe's voice, and that he heard O'Keefe provide the license-plate information. Later that evening, O'Keefe was instructed to report to police headquarters. Sebek testified that, when O'Keefe arrived, and before Sebek could say anything, O'Keefe stated that he had known Hernandez for several years and that Hernandez was involved in drugs. According to Sebek, O'Keefe admitted, without being asked, that he ran a license plate for Hernandez and that he knew it was a mistake. Sebek testified that he cut O'Keefe off and instructed him to complete a urinalysis test. Sebek accompanied O'Keefe to the testing center and then returned to police headquarters with O'Keefe. When the pair returned, O'Keefe's commander informed O'Keefe that he was suspended without pay. O'Keefe's urinalysis results indicated that he had cocaine in his system.

On June 16, 1995, the ISP Director filed a 10-count complaint with the Board, alleging numerous instances of official misconduct and requesting that O'Keefe be discharged. On February 1, 1996, O'Keefe filed a motion to quash his suspension and be reinstated or, alternatively, to be suspended with retroactive pay. O'Keefe also filed a motion to suppress the urinalysis test's results. On May 16, 1996, a hearing officer denied O'Keefe's motions.

The hearing officer conducted a hearing on ISP's complaint, spread over several dates between May 21, 1996, and July 30, 1996. On May 23, 1996, O'Keefe filed a supplemental motion to repress the urinalysis test's results, arguing that new evidence appeared indicating that an external chain-of-custody error had occurred. On September 24, 1996, after hearing testimony from several witnesses, including O'Keefe, Hernandez, Sebek, several physicians, and several ISP officials, the hearing officer denied O'Keefe's supplementary motion to suppress and submitted her proposed findings of facts and conclusions of law. The hearing officer found that O'Keefe knowingly associated with

drug traffickers, had observed illegal drug use but failed to report it to ISP, divulged confidential information to drug traffickers (including license-plate and drug enforcement information) in exchange for cocaine, used cocaine while on or off duty, and had sexually explicit materials and unauthorized weapons in his patrol car. Further, the hearing officer found that ISP met its burden in proving 9 of the 10 counts in its complaint. On October 31, 1996, the Board unanimously adopted the hearing officer's findings of fact and conclusions of law, and ordered that O'Keefe be removed and discharged from ISP.

On November 27, 1996, O'Keefe filed a petition for administrative review before the circuit court. O'Keefe argued that the investigation and suspension violated section 14 of the Act and the collective bargaining agreement between ISP and the Fraternal Order of Police (FOP), and that the Board improperly relied on his urinalysis test results despite procedural and custodial errors. On August 1, 1997, the circuit court found that ISP violated section 14 of the Act by suspending O'Keefe without pay and pending the hearing, and the court entered an order remanding the matter to the Board for payment of back pay. According to the transcript, the court also found that ISP violated section 14 of the Act by questioning O'Keefe without sufficient notice, and that evidence obtained from such questioning should have been suppressed pursuant to section 14a of the Act (20 ILCS 2610/14a (West 1998)), but that sufficient evidence nevertheless existed to support the Board's finding. Further, the circuit court refused to disturb the Board's findings with respect to O'Keefe's chain-of-custody argument and whether ISP violated the collective bargaining agreement. On August 22, 1998, O'Keefe advised the circuit court that he received his back pay, and the court entered a final order disposing of all matters before it. On September 11, 1998, O'Keefe filed the instant appeal.

On appeal before this court, O'Keefe again argues that ISP's investigation and suspension violated section 14 of the Act and the collective bargaining agreement between ISP and the FOP, and that the Board improperly relied on his urinalysis test results despite procedural and custodial errors. O'Keefe does not dispute the Board's factual findings or other conclusions of law.

## II. ANALYSIS

### A. Motion to Suppress O'Keefe's Statements

■ O'Keefe first argues that ISP failed to advise him on February 17, 1995, that he had a right to counsel and that his statements could be used against him, as required under section 14 of the Act. Section 14 of the Act reads in pertinent part as follows:

"Before any such officer may be interrogated or examined ***, the results of which *** may be the basis for filing charges seeking his or her suspension for more than 15 days or his or her removal or discharge, he or she shall be advised in writing as to what specific improper or illegal act he or she is alleged to have committed; he or she shall be advised in writing that his or her admissions made in the course of the hearing, interrogation or examination may be used as the basis for charges seeking his or her suspension, removal or discharge; and he or she shall be advised in writing that he or she has a right to counsel of his or her choosing, who may be present to advise him or her at any hearing, interrogation or examination." 20 ILCS 2610/14 (West 1998).

Further, under section 14a of the Act (20 ILCS 2610/14a (West 1998)), "statements or admissions obtained during the course of any hearing or interrogation not conducted in accordance with this Act may not be utilized against the officer in any subsequent disciplinary proceeding." Therefore, O'Keefe argues, the hearing officer erred by denying his motion to suppress his statement with regard to running license plates for Hernandez.

ISP disagrees, arguing that O'Keefe was never interrogated or examined. Instead, ISP argues, O'Keefe volunteered the information about Hernandez without being asked. Sebek testified that, before he had a chance to say anything, O'Keefe voluntarily admitted that he ran license-plate information for Hernandez. O'Keefe further admitted to Sebek that he knew it was a mistake and that he should not have done it. ISP Investigator Anthony Rapacz also testified that O'Keefe made this admission voluntarily. Rapacz further testified that he reminded O'Keefe that he was an FOP trustee, that they had a contract, and that he had rights. However, O'Keefe waved Rapacz off and continued to state that he should not have done it. According to Rapacz, O'Keefe said that he was sorry for putting the other officers in such an awkward position. O'Keefe himself even admitted that he immediately told Sebek and the officers that he "knew what this was about" and then proceeded to tell them what he thought it was about, namely, running the license plate for Hernandez. O'Keefe also admits in his brief that ISP never conducted an interrogation or examination.

We need not determine whether ISP violated section 14 of the Act because O'Keefe has waived this issue. While the record indicates that O'Keefe indeed filed a motion to suppress, O'Keefe fails to cite where, nor does review of the record indicate that, he raised the matter again during the proceedings. Rulings on motions to suppress are not final and may be changed or reversed at any time prior to final judgment. See *People v. Brooks*, 187 Ill. 2d 91, 127, 718 N.E.2d 88, 109 (1999).

Failure to ask the court or administrative body to reconsider the motion when that evidence is introduced at trial results in waiver of that issue on appeal. See *Brooks*, 187 Ill. 2d at 128, 718 N.E.2d at 109.

Even if we were to reach the merits of O'Keefe's claim and conclude that O'Keefe's statements should have been excluded, such error would be harmless. The gist of O'Keefe's statement was that he knew Hernandez, he knew Hernandez was involved with drugs, and that he ran a license plate for Hernandez earlier that day. O'Keefe's February 17, 1995, statements were cumulative and merely duplicated other testimony. Sebek, Barrows, and others testified that they heard Hernandez ask O'Keefe to run a particular license plate and that they heard O'Keefe supply the information that Hernandez requested. Hernandez testified that O'Keefe often ran license plates for him. Carroll Gibbs, a telecommunicator with ISP, testified that O'Keefe called her on February 17, 1995, and asked her to run the same license-plate number that Hernandez requested. O'Keefe himself testified during the hearing that he ran the license plate for Hernandez. Under these facts, even if the asserted error occurred, it would be harmless. See *People v. Wilkerson*, 87 Ill. 2d 151, 157, 429 N.E.2d 526, 528 (1981) (finding that error is harmless when "the evidence is cumulative or merely duplicates properly admitted evidence").

## B. Violation of the Collective Bargaining Agreement

■ O'Keefe next argues that his suspension violated the collective bargaining agreement between ISP and the FOP. Article 7 of the collective bargaining agreement provides in pertinent part:

> "b. No internal investigation will be conducted and no discipline may be issued unless a file initiation report has been completed."

O'Keefe contends that ISP violated the collective bargaining agreement by failing to complete the file initiation report until after O'Keefe's suspension and that such failure requires that this court reverse the Board's finding.

This argument lacks merit. Assuming, *arguendo*, that ISP in fact violated article 7 of the collective bargaining agreement, we find that the Board lacked jurisdiction to hear such a claim or provide a remedy for such a violation.

Section 8 of the Act (20 ILCS 2610/8 (West 1998)) provides in pertinent part that the "Board shall exercise jurisdiction over the certification for appointment and promotion, and over the discipline, removal, demotion and suspension of Department of State Police officers." O'Keefe fails to cite any authority indicating that the Board has authority to provide a remedy for a violated labor agreement. Further, the plain language of section 8 indicates that the Board has no such

power. Because the Board is a creature of statute, its powers are generally limited to those conferred upon it by statute. See *Schalz v. McHenry County Sheriff's Department Merit Comm'n*, 113 Ill. 2d 198, 202, 497 N.E.2d 731, 732-33 (1986). The Board's authority arises either from the Act's express language or by fair implication and intendment of the Act's express provisions as an incident to achieving the objectives for which the Board was created. See *Schalz*, 113 Ill. 2d at 202-03, 497 N.E.2d at 733. Section 8 of the Act clearly limits the Board's jurisdiction to disciplinary actions regarding an officer's conduct. O'Keefe's arguments relate not to his conduct but, rather, to ISP's alleged failure to adhere to a labor contract. We further note that, assuming the collective bargaining agreement is relevant here, article 8 of the agreement sets forth a separate procedure under which employees may file union grievances for agreement violations.

Further, assuming that the agreement is relevant here, O'Keefe has failed to cite any persuasive evidence in the record to indicate that the agreement was even broken. Barrows testified that she completed the report but that she could not recall whether she completed it on February 17, 1995, or February 20, 1995. Even if we were to make such a factual determination (see *Folbert v. Department of Human Rights*, 303 Ill. App. 3d 13, 26, 707 N.E.2d 590, 599 (1999) (stating that "it is not the function of the reviewing court to resolve factual disputes")), O'Keefe has failed to explain how a delay of one business day prejudiced him.

### C. Motion to Suppress Drug Test

Dr. Robert DuPont testified that O'Keefe's sample indicated that he had used cocaine within two or three days of the test. Dr. DuPont further testified that O'Keefe's sample contained an unusually high level of cocaine. ISP also presented evidence that a second facility also tested O'Keefe's sample and that it reached similar conclusions.

However, O'Keefe contends that the Board erred by considering his urinalysis results. Specifically, O'Keefe argues that such evidence should have been excluded due to an external custodial chain error that was identified when the urine sample reached the toxicology center. According to an affidavit filed by Carmen Mitelescu, a lab worker, the sample was sent to the laboratory in a taped box, but that the tape "broke in transit." This discrepancy, according to O'Keefe, was so significant that the Board should have granted his motion to suppress. We disagree.

The hearing officer found O'Keefe's argument unconvincing and determined that ISP established a sufficient custodial chain. Reviewing courts will not disturb the Board's ruling on the sufficiency of a

custodial chain absent an abuse of discretion. *Williamson v. Police Board*, 182 Ill. App. 3d 304, 310, 537 N.E.2d 1058, 1061 (1989). To support the Board's determination, the record must indicate that ISP took reasonable protective measures to ensure that the sample taken from O'Keefe was indeed the same sample tested in the laboratory. *Williamson*, 182 Ill. App. 3d at 310, 537 N.E.2d at 1061. To prevail, O'Keefe must present tangible suggestion of tampering, alteration or substitution. See *Williamson*, 182 Ill. App. 3d at 310, 537 N.E.2d at 1061. Mere speculation that the sample could have been altered is insufficient to undermine a custodial chain's adequacy. *Williamson*, 182 Ill. App. 3d at 310, 537 N.E.2d at 1061.

We find that sufficient evidence exists to support the Board's determination. Dr. Mohamad Rahmanian testified that, when a urine sample is collected, the sample is divided between two bottles. The bottles are then wrapped lengthwise with tamper-resistant tape and identified with a control number. The sample provider's initials and the date are also written on the tape. The bottles are then placed in a sealed bag, and the bag is placed inside a box. The box is then sealed with security tape baring the same control number. Dr. Rahmanian stated that the outer tape is designed to be fragile to prevent tampering. However, the tape is so fragile that it may be damaged during shipping. According to Dr. Rahmanian, such damage would not undermine the test's integrity so long as the bottles remain sealed. Dr. Donald Frederick testified on O'Keefe's behalf. Dr. Frederick similarly admitted that the box's seal does not necessarily affect the sample's integrity. O'Keefe does not dispute that, while the tape on the outer box was damaged, the seal on the bottles themselves remained intact. We further note that several doctors, including Frederick, testified that the tape on the outer boxes commonly breaks. Under these facts, we find that the broken tape on the outer box did not break the custodial chain.

O'Keefe further argues that Dr. DuPont improperly examined O'Keefe's specimen and verified the positive result before investigating the alleged custodial-chain error. ISP procedure requires that Dr. DuPont, as the ISP medical review officer, "receive all pertinent information" prior to making such a determination, and O'Keefe contends that this omission required that the Board suppress his drug-test results. While Dr. DuPont admitted that he indeed examined O'Keefe's sample before investigating the broken tape, this argument nevertheless lacks merit. As previously stated, the seals on the bottles themselves remained intact. Dr. DuPont testified that, in verifying that proper procedures were utilized, his concern is not for the tape on the box but, rather, the integrity of the specimen bottle. We further

note that Dr. DuPont regularly contacts the provider of a positive sample to ask a series of questions that might establish an alternative reason for the positive result. Dr. DuPont left such a message for O'Keefe, but O'Keefe did not return his call.

Citing *People v. Slaughter*, 149 Ill. App. 3d 183, 500 N.E.2d 662 (1986), O'Keefe next argues that the testing facility improperly stored his sample in an unlocked refrigerator. Failure to store the sample securely, O'Keefe contends, violated ISP procedures and constituted a break in the custodial chain. We find that *Slaughter*'s facts are inapposite to the instant case. In *Slaughter*, the State acknowledged that the evidence at issue, an envelope containing two hand-rolled marijuana cigarettes, was handled in a lackadaisical manner. *Slaughter*, 149 Ill. App. 3d at 186, 500 N.E.2d at 665. Further, the court noted:

> "[T]he testimony is wholly inadequate to 'match' the description of the envelope ***. [The corrections officer] did not testify to the color, or the size, of the envelope into which he put the cigarettes he found ***. He also did not state that he ever sealed the envelope, marked, labelled, or identified the envelope, or that he inventoried the envelope.
>
> Furthermore, the evidence *** is insufficient to trace the individuals who did have access to the envelope, or the number of persons who could have had access to it. ***
>
> In addition, the record does not establish the degree to which access was restricted to the correctional facility's safe. [The officer] stated that he himself 'dropped' the envelope into the safe. He also stated that the safe was accessible to two persons, the lieutenant and the facility's accountant. Because [the officer's] access to the safe enabled him to drop the envelope into the safe, we cannot determine the degree to which access to the safe was permitted, beyond the two persons *** specified at the hearing. Also, although [the officer] testified that the safe was of the type which is locked by a key, he did not state that it was locked ***.
>
> *** The record is also inconclusive with respect to whether access was restricted to the correctional facility's safe in which the guard placed the envelope containing the cannabis. We therefore determine that the State failed to establish a proper chain of custody of the cannabis evidence it presented at the revocation hearing." *Slaughter*, 149 Ill. App. 3d at 186-87.

The veritable litany of errors identified by the court in *Slaughter* simply does not exist in this case. In *Slaughter*, the court relied on numerous factors, *including* the fact that the record failed to adequately show whether others had access to the safe and whether the envelope had been sealed. Here, access is not a dispositive issue because the fact remains that the container's inner seals remained

intact and, therefore, the sample was in fact not disturbed. Carmen Mitelescu testified that she collected O'Keefe's sample and placed it in a triple-sealed container. Mitelescu wrote the date, O'Keefe's initials, and a control number on the seals. That the inner seals remained intact negates the conclusion that someone tampered with the sample.

## D. Cross-Appeal

On cross-appeal, ISP argues that the circuit court misinterpreted section 14 of the Act and erred in finding that the Board should have granted O'Keefe's motion to quash his unpaid suspension. We disagree. Statutory construction is a matter of law and is considered *de novo. Branson v. Department of Revenue*, 168 Ill. 2d 247, 254, 659 N.E.2d 961, 965 (1995). The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81, 630 N.E.2d 820, 822 (1994). To determine the legislature's intent, courts first look to the statute's language. *Zekman v. Direct American Marketers, Inc.*, 182 Ill. 2d 359, 368-69, 695 N.E.2d 853, 858 (1998). Statutory provisions relating to the same subject matter should be construed harmoniously where possible. *Rawles v. Hartman*, 172 Ill. App. 3d 931, 936, 527 N.E.2d 680, 682 (1988). The relevant portion of section 14 of the Act states as follows:

"Except as is otherwise provided in this Act, no Department of State Police officer shall be *removed*, demoted or *suspended* except for *cause, upon written charges filed* with the Board by the Director and a *hearing* before the Board thereon upon *not less than 10 days' notice* at a place to be designated by the chairman thereof. At such hearing, the accused shall be afforded full opportunity to be heard in his or her own defense and to produce proof in his or her defense." (Emphasis added.) 20 ILCS 2610/14 (West 1998).

Section 13 of the Act also provides for suspensions and states in pertinent part as follows:

"Disciplinary measures prescribed by the Board for Department of State Police officers may be taken by the Director for the punishment of infractions of the rules and regulations of the respective divisions as promulgated by the Department. Such disciplinary measures may include *suspension* of any such officer for a reasonable period, *not exceeding 30 days*." (Emphasis added.) 20 ILCS 2610/13 (West 1998).

Construing sections 13 and 14 together, we find that the Director may impose disciplinary measures, including suspension, on officers for a reasonable period not exceeding 30 days. Illinois courts have upheld such suspensions even if they were unpaid. See, *e.g., Scott v. Illinois State Police Merit Board*, 222 Ill. App. 3d 496, 584 N.E.2d 199

*(1991); Clark v. Morris*, 99 Ill. App. 2d 24, 31, 240 N.E.2d 515, 518 (1968). However, before ISP may suspend an officer beyond 30 days, it must have cause, must file written charges with the Board, and must hold a hearing, to which officers must receive not less than 10 days' notice. The record indicates that ISP suspended O'Keefe without pay for approximately four months before filing written charges and providing him with the hearing required under section 14 of the Act.

ISP contends that section 14 does not apply here, arguing that "it did not file a complaint with the Merit Board seeking the *suspension* of O'Keefe in this case, but rather his *discharge.*" (Emphasis in original.) ISP asserts that two types of suspensions exist. According to ISP, "O'Keefe's suspension pending discharge was not a *disciplinary suspension* but rather an *administrative suspension*" intended to remove a corrupt officer from the street pending a hearing. (Emphasis in original.) O'Keefe disagrees, arguing that the Act's plain language makes no such distinction. While the hearing officer agreed with ISP, the circuit court rejected ISP's argument, finding:

> "[Section] 14 of the Police Act could hardly be clearer in its requirement that written charges be filed with the board before any disciplinary action takes place. Here, it is undisputed that no such charges were filed until June 16, 1995, four months after O'Keefe was indefinitely suspended. *** The hearing officer found that the requirements'[of section 14] were followed. *** The court finds that the hearing officer's construction of [section 14] were [*sic*] erroneous and, consequently, rejects the result reached by the hearing officer [with respect to O'Keefe's motion to quash]."

We find the circuit court's interpretation of section 14 persuasive. Courts must accord a statute's language with its plain and commonly understood meaning. *R.L. Polk & Co. v. Ryan*, 296 Ill. App. 3d 132, 140, 694 N.E.2d 1027, 1033 (1998). Our review of section 14 indicates that it makes no distinction between administrative and disciplinary suspensions and we must not depart from its plain language by reading into it exceptions, limitations, or conditions that the legislature did not express. See *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189, 561 N.E.2d 656, 291 (1990). While we agree with ISP's assertion that it "should not be put in the position of *** permitting an officer of dubious character to remain on duty pending discharge proceedings," we do not agree that it may place an officer on unpaid suspension while it drags its feet for nearly four months before filing written charges and providing the accused officer with the hearing to which he or she is entitled under section 14. Had ISP wished to avoid providing O'Keefe with "a happy boon and a favor, *i.e.*, pay without work," it should have filed charges and granted his hearing more promptly. We further

reject ISP's argument that a four-month suspension without pay is acceptable because, had the Board exonerated O'Keefe, he would have been entitled to back pay, interest, and benefits pursuant to section 14 of the Act. Officers exonerated after four months of unpaid suspension, followed by a hearing and then another four months awaiting a determination, will have sustained severe financial harm that cannot necessarily be remedied by back pay with interest.

We find that ISP had authority to suspend O'Keefe without pay for 30 days pursuant to section 13 of the Act. Had ISP found it necessary to suspend O'Keefe for a period exceeding 30 days, it was required under section 14 to file written charges and provide him with a hearing.

## III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's determination.

Affirmed.

ZWICK, P.J., and CAMPBELL, J., concur.