NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230650-U

NO. 4-23-0650

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 22, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| DARRYL LYLES, | ) | No. 20CF849 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Robert Randall Wilt, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The appellate court reversed, finding the circuit court's ruling on the motion to suppress was against the manifest weight of the evidence.

¶ 2   In September 2020, the State charged defendant, Darryl Lyles, with 12 counts of first degree murder (720 ILCS 5/9-l(a)(1), (2) (West 2020)), 4 counts of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2020)), and 6 counts of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.l(a) (West 2020)). Defendant filed a motion to suppress identification evidence obtained during a photo lineup procedure he alleged was unduly suggestive, which the circuit court granted in part.

¶ 3   The State appeals, seeking interlocutory review of the circuit court's order pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Apr. July 1, 2017). We reverse.

¶ 4                                    I. BACKGROUND

¶ 5          In September 2020, the State charged defendant with 12 counts of first degree murder (720 ILCS 5/9-l(a)(1), (2) (West 2020)), 4 counts of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2020)), and 6 counts of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.l(a) (West 2020)).

¶ 6          Detective Christopher Jones of the Rockford Police Department (RPD) indicated by affidavit of probable cause that on May 4, 2020, Rockford police officers responded to a Shot Spotter alert for three shots fired at an apartment located at 1135 Benton Street in Rockford, Illinois. While en route, the officers learned a gunshot victim, Clifton Totton, was being transported to Swedish American Hospital. Totton later died at the hospital.

¶ 7          The renter of the apartment, Tierra Hubbard, witnessed the shooting. She told officers she had been hosting defendant, Totten, and other people at her apartment that evening. At some point, an argument started, and Tierra said that some of the other occupants attempted to force defendant out the back door of the apartment. Tierra stated, as defendant was being forced out, he drew a handgun and shot Totton several times. Defendant then fled the scene in an SUV parked behind Tierra's residence.

¶ 8          Two days after the shooting, RPD officers conducted a video-recorded interview with Tierra's aunt, Sherron Hubbard, who also witnessed the shooting. Sherron told the officers that, shortly before the shooting occurred, she had gone to visit Tierra at her apartment. When Sherron went inside, she observed Tierra having a disagreement with someone. Later, Sherron saw defendant standing by the back door of the apartment as she left. After she got back in her car, she stated she saw defendant shooting into Tierra's apartment from the apartment's stoop while holding the screen door open. Sherron ultimately indicated she knew defendant by his

nickname and was familiar with how he looked because he grew up with her nephew. She also recognized the SUV parked at the scene as one she frequently saw her nephew and defendant in together.

¶ 9        After the officers' interview with Sherron, another officer, later identified as Detective Sean Welsh of the RPD, entered the interview room to administer a photo lineup. Before the lineup began, Welsh told Sherron he did not know anything about the investigation. He also had Sherron sign a lineup advisement form after reading her the following admonishments:

> "I understand the following: The persons in this lineup and I may be recorded for the purpose of accurately documenting all statements made by me unless [I] refuse to be recorded. *** The perpetrator of the crime may or may not be presented in this lineup. The administrator *** of this lineup does not know the suspected perpetrator's identity. Do not feel compelled to make an identification. It is as important to exclude innocent persons as it is to identify a perpetrator. The investigation will continue regardless of whether an identification is made."

Welsh then showed Sherron the lineup and asked her if she recognized anyone in the pictures. Sherron identified defendant in one of the photos and said she recognized him "from growing up with [her] kids." When asked how else she knew defendant, Sherron stated, "[T]hat's about it." Welsh then asked Sherron if she recognized defendant from anything recently, to which Sherron replied, "Just a couple days ago I seen him for what we doing right now." Sherron continued, "I seen him at the place where the victim was killed at, was shot at." When asked about defendant's involvement, Sherron responded, "He had to be arguing because he was standing in the doorway and my niece was telling him, 'Don't disrespect my kids.' " Sherron told Welsh, "[Defendant]

stood there *** and I left right on out *** and a few minutes after that, seat belt on, put the car in drive *** I seen the flashes *** I just seen him like." Then, Sherron raised her right hand imitating someone firing a gun. Sherron added, "The hand was going, he was letting go."

¶ 10        In June 2022, defendant filed a motion to suppress identification evidence, claiming, in relevant part, the conduct of the police "was such as to improperly suggest the identification *** of defendant as the perpetrator of the offense" by Sherron during the photo lineup. The video was made available to the circuit court and is a part of the record.

¶ 11        At the suppression hearing, RPD officer Scott St. Vincent testified he was one of the officers who interviewed Sherron after the shooting. During the interview, Sherron recounted the events, as she witnessed them, leading up to and after the shooting. She told the officers she was "very familiar" with defendant because he had been "friends for the majority of his life with her older children." She also recognized defendant's vehicle at the scene and recalled seeing the flashes from the gun as defendant fired it.

¶ 12        Detective Welsh testified he "just happened to be there" when Sherron was interviewed and was asked to show her a photo lineup as the independent administrator. Welsh did not know if the present investigation remained unsolved or ongoing. He did not prepare the photo lineup, and he went over the "lineup admission form" with Sherron before showing her the photos. Welsh testified he "asked [Sherron] to elaborate a little bit further on if [defendant] was involved in any recent incident that may be under investigation" because he "was just curious if there was anything related to a case that was currently being investigated," and he wanted to ensure she said everything she recognized defendant from. Welsh did not know Sherron had seen anything recently involving anyone in the lineup. Welsh recalled Sherron bringing up the fact

that she had seen defendant involved in the shooting investigation for which she was being interviewed.

¶ 13        Following the parties' arguments, the circuit court was "not convinced that Sean Welsh was *** a true independent administrator of the photo array in this particular case," and it believed "he abandoned any sign of neutrality and converted himself to an investigator almost immediately." The court noted that "[t]he independent administrator is not supposed to know that a suspect's photograph is in there for certain." However, the court determined Welsh "obviously knew something was going on *** by the fact that he wasn't willing to accept [Sherron's] statement that [defendant] was somebody she knew from growing up with her children." The court noted that if Welsh "were truly an independent administrator, he would have stopped right then and there because he had no reason to believe that [defendant] was anything more than that." But "he didn't stop," and the court noted Welsh "led [Sherron] to talk *** more about the incident" and "was not willing to accept her answer."

¶ 14        Further, the circuit court stated, "[U]nder the statute 107A-2 subsection F, subsection 11 [(725 ILCS 5/107A-2(f)(11) (West 2022))], if a witness identifies *** somebody as a perpetrator, they are not to discuss the details with them until the ID process has been completed." Yet Welsh "kept pressing for more and more information until *** [Sherron] indicated that [defendant] might have been the shooter, and she talked about him waiving [*sic*] his hands as if he might have been shooting a gun." Therefore, the court found Welsh was not a truly independent administrator, and the photo lineup procedure conducted by him was "suggestive to the extent that Sherron Hubbard was pressured to implicate [defendant] as being involved in the offense." The court then granted the motion to suppress Sherron's identification and required the State to present an independent basis to call her for an in-court identification.

¶ 15    The State subsequently filed a notice of appeal and certification of substantial impairment, noting the circuit court's order excluding evidence substantially impaired its ability to further prosecute the case.

¶ 16    II. ANALYSIS

¶ 17    On appeal, the State claims the circuit court erred by granting defendant's motion to suppress Sherron's identification. Specifically, the State argues the court's finding that Welsh was not an independent administrator of the photo lineup was against the manifest weight of the evidence. We agree with the State.

¶ 18    Initially, we note defendant, as the appellee, did not file a brief in this matter. In the absence of an appellee's brief, a reviewing court has three discretionary options it may exercise:

> "(1) it may serve as an advocate for the appellee and decide the
> case when the court determines justice so requires, (2) it may
> decide the merits of the case if the record is simple and the issues
> can be easily decided without the aid of the appellee's brief, or
> (3) it may reverse the [circuit] court when the appellant's brief
> demonstrates *prima facie* reversible error that is supported by the
> record." *Thomas v. Koe*, 395 Ill. App. 3d 570, 577, 924 N.E.2d
> 1093, 1099 (2009).

Here, the record is simple, and the issue may be decided without the aid of an appellee's brief.

¶ 19    Turning to the merits, courts employ a two-part test to determine whether an identification procedure comports with due process. First, when challenging the propriety of a pretrial identification procedure, the defendant bears the burden of proving the procedure was

unduly suggestive and created a substantial likelihood of misidentification. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 95, 126 N.E.3d 632. Second, the State may rebut the defendant's showing by "clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *People v. Brooks*, 187 Ill. 2d 91, 126, 718 N.E.2d 88, 108 (1999). Courts look to the totality of circumstances when deciding whether the identification was unduly suggestive as the defendant claims. *Corral*, 2019 IL App (1st) 171501, ¶ 95. We review the circuit court's factual determination on the suggestibility of the identification procedure under a manifest-weight-of-the-evidence standard. *Corral*, 2019 IL App (1st) 171501, ¶ 95. "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215, 647 N.E.2d 273, 277 (1995).

¶ 20       In this case, the circuit court found that the procedure utilized by Welsh as the independent administrator of the photo lineup presented to Sherron was "suggestive to the extent that [she] was pressured to implicate [defendant] as being involved in the offense." As a result, the court suppressed Sherron's identification and found that if the State wished to call her at trial, it must first establish an independent basis for Sherron's in-court identification in a hearing outside the presence of the jury. Having carefully reviewed the videotape of the photo lineup, the transcripts from the suppression hearing, and the evidence of record, our review of the record reveals Sherron did not identify defendant as the shooter by any suggestive procedures employed by the police.

¶ 21       Relevant here, section 5/107A-2(a)(1), (a)(4) of the Code of Criminal Procedure of 1963 provides that an independent administrator without any knowledge of the identity of the suspect shall conduct the lineup, unless it is not practical. 725 ILCS 5/107A-2(a)(1), (a)(4) (West

2022). The statute further provides that, in conducting a lineup, "If the eyewitness identifies a person as the perpetrator, the eyewitness shall not be provided any information concerning the person until after the lineup is completed." 725 ILCS 5/107A-2(f)(11) (West 2022).

¶ 22　　　　At the suppression hearing, Welsh testified he was asked to administer the photo lineup because he "just happened to be there" when Sherron was interviewed. Before showing her the photos, Welsh told Sherron he did not know anything about the investigation. He also went over the admonishments from the "lineup admission form" and asked Sherron if she understood them. We note Sherron's interview took place just two days after the shooting. By the time Welsh administered the photo lineup, Sherron had already told the interviewing officers that she recognized defendant as the shooter. She recognized defendant as he stood by Tierra's back door that evening. She saw defendant as he fired into Tierra's apartment from the stoop by the back door. Sherron was "very familiar" with how defendant looked because he grew up with her children. She also recognized defendant's SUV parked at the scene because she frequently saw her nephew in it with him. She identified defendant in the lineup without hesitation.

¶ 23　　　　Moreover, nothing in the record supports the circuit court's conclusion that Welsh was not "truly an independent administrator" because he sought clarification after Sherron identified defendant in the lineup as someone who grew up with her kids. In fact, nothing in the record even suggests Welsh was aware of defendant's identity or that he gave Sherron any information about defendant at all. See 725 ILCS 5/107A-2(a)(1), (a)(4), (f)(11) (West 2022). Moreover, Sherron's initial statement to Welsh did not "identif[y] a person as the perpetrator," as provided in section 107A-2(f)(11), thereby precluding any further inquiry. 725 ILCS 5/107A-2(f)(11) (West 2022). Sherron knew why she was being asked to identify someone and related how she knew him, not that she identified him as the perpetrator. Welsh's inquiry was only to

determine whether her identification related, in any way, to the reason for the lineup. Welsh testified he only asked Sherron if she recognized defendant from anything recently because he "was just curious if there was anything related to a case that was currently being investigated" and wanted to ensure she said everything she recognized defendant from. He did not know if the investigation remained unsolved or ongoing. He did not prepare the photo lineup. Further, Welsh testified he did not know if Sherron had seen anything recently involving anyone in the lineup, and it was ultimately Sherron who clarified that she had seen defendant involved in the shooting for which she was being interviewed. Sherron's recognition of defendant was not relevant unless she was identifying him as somehow involved in the reason for the investigation, and Welsh's inquiry was only to clarify her identification. The court's concern regarding Welsh's inquiry ignores the fact Sherron had already made it clear she was able to recognize defendant but had said nothing about his involvement.

¶ 24    Because the evidence leads us clearly to the opposite conclusion, the circuit court's judgment granting defendant's motion to suppress Sherron's identification is reversed where its determination Welsh was not truly an independent administrator and the photo lineup procedure conducted by him was "suggestive to the extent that Sherron Hubbard was pressured to implicate [defendant]" stood against the manifest weight of the evidence. *Volant*, 164 Ill. 2d at 215.

¶ 25                                III. CONCLUSION

¶ 26    For all these reasons, we reverse the circuit court's judgment.

¶ 27    Reversed.